Marianne Dugan (OSB # 932563)
Internet e-mail address mdugan@mdugan.com
259 E. 5th Ave., Suite 200-D
Eugene, OR 97401
(541) 338-7072
Fax no. 866-650-5213
        Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CHIXAPKAID DONALD MICHAEL PAVEL, | No. 6:16-CV-00819-AA |
| Plaintiff, | PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| UNIVERSITY OF OREGON; DOUG BLANDY; PENELOPE DAUGHERTY; ANNIE BENTZ; RANDY KAMPHAUS; JULIET A. BAXTER; JANNE UNDERRINER; JASON YOUNKER; and BRIAN KLOPOTEK, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

Plaintiff responds in opposition to defendants' motion for partial summary judgment.

**FACTUAL BACKGROUND**

As explained in the Declarations of plaintiff, Dr. Pavel, and the then-Union Grievance

Chair Debra Merskin, the process offered by the University was deeply flawed.

Until January 21, 2015, Dr. Pavel was a full professor at the University of Oregon.  Full

professor status requires a strong showing of productivity as a scholar; engagement as an

instructor; and commitment of service to the community.  Pavel Decl. ¶ 2.  Dr. Pavel was a

nationally renowned scholar in his field of study and had received many honors as a

distinguished professor.  Id.

PAGE 1 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Dr. Pavel learned November 21, 2014, that he had been accused of sexual harassment by a female undergraduate student, and was being placed on administrative leave. <u>Id</u>. ¶ 3.  On December 18, 2014, he attended a meeting with Affirmative Action/Equal Opportunity investigators Penny Daugherty and Anne Bonner; and the Union Grievance Chair, Debra Merskin.  <u>Id</u>. ¶ 4.  That meeting started with a flurry of documents shoved towards Dr. Pavel, one after the other, to the extent where even Ms. Bonner was confused about which policy she was talking about.  The hostility from the investigators was clear from the start.  <u>Id</u>. ¶ 5.  Any attempt at an answer Dr. Pavel provided became contested.

At that meeting the investigators were focused on an alleged "pattern" of behavior.  <u>Id</u>. ¶ 6; Decl of Merskin ¶ 3.  At some point during the meeting Dr. Pavel heard something along the lines of, "this investigation will find other instances, to establish a pattern.  We're going to find a pattern; you might as well admit it."  They demanded he admit things he had not done, with only vague explanations of what he was being accused of.  He was in shock.  That went on for thirty or forty minutes.  Pavel Decl. ¶ 6.  Even though Ms. Bonner said she was to lead the meeting, Ms. Daugherty kept inserting her own comments, directed Ms. Bonner on what she could and could not do, and brought up an alleged past incident with a female graduate student and vaguely alluded to other alleged past incidents, without stating any details or providing any opportunity to Dr. Pavel to respond to those allusions during the meeting.

Until this lawsuit was filed, no one ever provided Dr. Pavel with any written documentation of what the female undergraduate student accused him of doing.  <u>Id</u>. ¶ 7.  Information Dr. Pavel and his Union requested (listed on Exhibit A) was not provided to him.  The attorney handling his grievance on behalf of the Union did finally obtain some of the

PAGE 2 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

requested information but was not allowed to share it with Dr. Pavel.  Even his request to see the police report, which had already been released to the media, was denied.  Pavel Decl. ¶ 7.

Finally the investigators said, "You can speak."  Id ¶ 8.  Dr. Pavel asked whether he had a right to see a copy of these allegations and what the student had said.  They said, "Yes, you do." They said they would send it to the Union for him.  Afterwards, however, Ms. Daugherty sent an email that said they would not give Dr. Pavel anything in writing but would orally tell him the allegations, which is what they had already done.  Id.

Dr. Pavel did deny the allegations, as they were untrue, but without written explanation of the allegations against him he did not feel able to meaningfully respond to the allegations.  Id. ¶ 9.

Debra Merskin, then the Chair of the Union Grievance Committee, has a similar recollection of the December 2013 meeting.  She states:

> During my participation as union representative for Dr. Pavel, no one ever provided to Dr. Pavel any written documentation of what he was accused of doing.  As with other investigations I have observed, the Affirmative Action/Equal Opportunity investigator only orally represents that "it has been reported that" certain things occurred. Like any accused person, Dr. Pavel was visibly greatly stressed during the meeting, and as with most of these AA/EO investigation meetings, the investigative process lacks all sense of compassion but rather presents a presumption of guilt with no meaningful opportunity to speak on one's behalf.  Dr. Pavel was advised by the Union to listen rather than making a statement, but there also was only one very small opportunity for him to say anything during the meeting anyway.  When asked at one point whether he had done any of the acts that "had been reported," he answered "No, No. No."  But he was not given an opportunity during the meeting to present a full explanation or response.

Merskin Decl. ¶ 4.  She further comments:

> 8.  The system AA/EO system deals with accused people in a very passive-aggressive, disrespectful way – like a scolding parent to a child.  The person accused is never given any documents, is told they will hear some time in the future about this, and is never given a meaningful opportunity to state his or her side.  In Dr. Pavel's meeting, as in other meetings I have attended, AA/EO makes clear that the accused is presumed

guilty from the outset and is done for, now that Affirmative Action/Equal Opportunity
has gotten involved.

      9.  Given that Dr. Pavel was not given the accusations in writing, and was simply
bombarded with a flurry of policy documents and verbal interrogation, during the
December 2014 meeting Dr. Pavel was not given a meaningful opportunity to respond to
the accusations.

      10.  After the meeting, Dr. Pavel was still not given the accusations in writing,
and given my past experience with the AA/EO process, and the hostile, accusatory tone
of the December meeting, it seemed to me a foregone conclusion that the investigation
would determine that he was guilty as charged and he would be disciplined in some way.

Merskin Decl. ¶¶ 8-10.

There was a second meeting on January 16, 2015, between Doug Blandy (Senior Vice

Provost for Academic Affairs); Randy Kamphaus (Dean of the College of Education); Bill Brady

(University of Oregon Senior Director of Employment and Labor Relations), Dave Cecil (head

of the Union), Debra Merskin; and Dr. Pavel, at which he was told that in two working days he

would be terminated.  Dr. Pavel was not given any indication prior to this meeting that he would

be terminated.  Pavel Decl. ¶ 10; Merskin Decl. ¶ 5.

After its investigation lasting over two months, defendants gave Dr. Pavel only one

business day (Friday January 16 to Tuesday, January 20, 2015, with January 19 being Martin

Luther King Day) to provide a written statement challenging the termination action and to

provide any additional evidence he believed was relevant to its action.  Pavel Decl. ¶ 11.

As far as can be determined from the documents available to plaintiff at this time, no

discipline short of termination was ever considered, even though the Collective Bargaining

Agreement (CBA) promises that "[d]iscipline will be administered in a progressive manner,"

with several types of discipline being listed, including written reprimand; demotion; loss of or

reduction in benefits; suspension with or without pay of various lengths; reduction of perquisites

PAGE 4 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

or salary; and loss of tenure.  Exhibit B at 2-3.  The CBA does state that some behavior is severe enough to warrant immediate termination, but neither the CBA nor any information ever given to Dr. Pavel warned him that he faced immediate termination based on a single formal complaint of sexual harassment.  Pavel Decl. ¶ 12.

Neither Dr. Pavel, nor Debra Merskin is not aware of any other tenured faculty at the University of Oregon being involuntarily terminated for any reason.  Pavel Decl. ¶ 13; Merskin Decl. ¶ 6.  Indeed, Blandy (Senior Vice Provost for Academic Affairs) and Daugherty (then head of Affirmative Action/Equal Opportunity) both testified that they knew of no tenured professors ever terminated involuntarily, for any reason.  Dugan Decl. Exhibit C (Blandy Tr. at 15-16, 23-38); Exhibit D (Daugherty Tr. at 40-44).  The decision to terminate Dr. Pavel was entirely unprecedented and unexpected.

Dr. Pavel thought there would be a conversation and the opportunity to speak for himself at the January 2015 meeting.  Pavel Decl. ¶ 13.  Instead, he was simply told the university has a zero tolerance policy on these matters and that he was terminated, with no reconsideration possible.  Id.; Merskin Decl. ¶ 7.

Ultimately the Union made the decision not to proceed to arbitration, but that was not Dr. Pavel's decision.  Pavel Decl. ¶ 14; Merskin Decl. ¶ 11.  Under the CBA only the Union can make that decision.  Dr. Pavel would have gone to arbitration if he was allowed to make that decision himself, as he did not inappropriately touch or in any way sexually harass the student.  Pavel Decl. ¶ 14; Merskin Decl. ¶ 11.

At some point in the past (likely in 2012), Mia Tuan and Jerry Rosiek from Dr. Pavel's Department had spoken to him about a female graduate student's allegations about him.  Pavel

PAGE 5 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Decl. ¶ 15.  They told him it was "informal," and never stated they were disciplining him nor that they were substantiating a complaint.  This was not documented in writing and there is nothing in Dr. Pavel's personnel file about their conversation with him.  They told Dr. Pavel there had been an anonymous complaint.  Id.  At no time did Dr. Pavel touch the female graduate student or make any verbal or physical suggestions or gestures of romantic or sexual involvement.  Id. ¶ 16.

Dr. Tuan and Dr. Rosiek did not give Dr. Pavel any sort of warning as to any particular type of behavior and did not tell him he was being disciplined.  Id. ¶ 17.  Similarly, when Annie Bentz from AA/EO spoke with Dr. Pavel about that same graduate student's allegations, she did not tell him it was an investigation nor did she invite him to give his statement as to what happened.  She did not give him any sort of warning as to any particular type of behavior and did not tell him he was being disciplined.  Id.

At some point in the past Jill Baxter (then Department Head of the Education Studies) told Dr. Pavel she wanted to talk to him about a complaint by a male student.  Id. ¶ 18.  She did not clarify what the complaint was about, and she told Dr. Pavel she did not want him to worry about it.  Later another colleague told Dr. Pavel he was told that the student had complained about him as well, and that the complaints were found to be unsustained.  No response was requested from Dr. Pavel and no details were ever given to him.  Id.

There is nothing in Dr. Pavel's personnel file that mentions the alleged complaints from the female graduate student and the male student.  Pavel Decl. ¶ 19.  Nor is there any other complaint or discipline of any sort in his personnel file (other than the undergraduate student's complaint that triggered his termination).  Id.  The CBA states that oral reprimands do not

constitute discipline.  Exhibit B at 2-3.

It was not until after Dr. Pavel filed this lawsuit that he learned that one or more people at the University had circulated rumors of sexual harassment against him, and he was not given any opportunity to respond to these baseless rumors.  Id. ¶ 20.

In addition to losing his job as a tenured full professor at the University of Oregon, the stigma caused by the publicizing in the newspaper and other local media of the allegations against Dr. Pavel, widespread villainizing of him on social networking, combined with his termination, have made it impossible for Dr. Pavel to find another job in his chosen field, as a professor.  Id. ¶ 21.  Not only did he lose his income from wages, but he also lost his association with existing grants (the Indian Teacher Training Grant, the National Indian Education Study, and others), and has suffered what at this point appears to be irreparable damage to his future ability to obtain grants.

There are several sources of income Dr. Pavel previously had which have been withdrawn due to his termination and the defamatory statements about him.  Id. ¶ 22.  For example, Dr. Pavel has had only had one speaking engagement since being fired, and there was no fee involved; whereas previously he had dozens of speaking requests each year, generally for a fee.  Due to being terminated and the reporting of the false allegations against him, Dr. Pavel lost a contract with the American Indian College Fund as an external evaluator for the "Sacred Little Ones" program.  His termination and the false allegations also heavily curtailed his invitations to work with all tribal colleges and universities; and he lost a grant to work with the State Early Learning program.  An invitation to conduct nonprofit training in Montana was rescinded.  He had developed an external evaluation for the Muckleshoot Tribal School, which

was rejected after his termination.  He was taken off of doctoral committees.  Id.

Dr. Pavel suffered likely irreparable damage to his reputation.  Pavel Decl. ¶ 23.  The

defendants' actions in releasing the police report to the local newspaper and other media have

forever falsely labeled him as a sexual predator.

When terminated, Dr. Pavel was about to receive one of the most prestigious

international awards for indigenous scholars, from the American Educational Research

Association's Indigenous Peoples of the Americas Special Interest Group.  The award was

rescinded with chastising justification.  Id. ¶ 24.

The stigma of the public disclosure and termination was in fact enhanced by Dr. Pavel's

distinguished position in the academic community.  Id. ¶ 25.  Some people in that community

know only that he was fired, and vague knowledge that it had something to do with being a

sexual predator.  The damage is severe and likely irreparable at this point.

At no point was Dr. Pavel offered a name-clearing hearing.  Id. ¶ 26.  As noted above,

Dr. Pavel was not allowed to pursue arbitration because the Union chose not to do so.

**DEFENDANTS ARE INCORRECT IN ASSERTING THAT PLAINTIFF HAS NOT PRESENTED A SUBSTANTIVE DUE PROCESS CLAIM – DR. PAVEL HAS PRESENTED SUFFICIENT EVIDENCE OF STIGMATIZING EFFECTS OF THE UNIVERSITY'S ACTIONS TO PRESENT HIS CASE TO A JURY**

Defendant argues in a footnote (Def's Br. at 2 n. 1) that plaintiff cannot meet the "stigma

plus" test because he was not entirely precluded from his occupation.  The correct test, as set

forth in Engquist v. Oregon Dept. of Agriculture, is whether the employer's "stigmatizing actions

make it virtually impossible for the employee to find new employment in his chosen field."  478

F.3d 985, 998 (9th Cir. 2007).  The allegations in Dr. Pavel's declaration at paragraphs 21-25, as

noted supra, make clear that this is the case.  At the very least he has presented sufficient

PAGE 8 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

disputed facts to present his claim to a jury.

**THE QUESTION OF WHETHER THE PROCESS PROVIDED DURING THE INVESTIGATION WAS ADEQUATE IS A DISPUTED QUESTION OF FACT**

Defendants point to the fact that it offered some process to plaintiff and gave him some notice to him of the allegations, and an opportunity to respond.

As explained supra, and supported by the declarations submitted herewith, the process provided was deeply flawed, and this issue should be submitted to a jury. See, e.g., Weinberg v. Whatcom County, 241 F.3d 746, 750 (9th Cir. 2001) (holding that the question of whether process provided was adequate was a question of fact); Turrado-Garcia v. I.N.S., 933 F.2d 1016 (9th Cir. 1991) (same).

"[F]air play . . . is the essence of due process." Galvan v. Press, 347 U.S. 522, 530, 74 S. Ct. 737 (1954). As the Ninth Circuit explained:

> Fundamental requirements of due process include notice, "reasonably calculated, under all the circumstances, to apprise interested parties" of the ruling or action, and an opportunity to be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The means employed to provide notice must be "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Id. at 315.

Spence v. South, 107 F.3d 17 (9th Cir. 1997).

The Fourteenth Amendment protects against the deprivation of property or liberty without procedural due process. Carey v. Piphus, 435 U.S. 247, 259, 98 S. Ct. 1042 (1978). In the context of protected public employment, procedural due process requires a pre-termination hearing in which the employee is given "[t]he opportunity to present reasons . . . why proposed action should not be taken," meaning that the employee must be allowed to respond to the charges and evidence presented by the employer as grounds for depriving the employee of their protected property or liberty interest in continued employment. Cleveland Board of Education v.

PAGE 9 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

<u>Loudermill</u>, 470 U.S. 532, 545-46 (1985) (citations omitted).  Essential to this requirement are the need for: 1)"oral or written notice of the charges against [the employee]"; 2) "an explanation of the employer's evidence"; and, 3) "an opportunity to present [the employee's] side of the story."  <u>Id</u>.  This is another iteration of the long-standing requirement of the Fourteenth Amendment procedural due process clause of notice and an opportunity to be heard.  <u>See, e.g.</u>, <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313, 70 S. Ct. 652 (1950) ("words of the Due Process Clause . . . require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."); <u>Boddie v. Connecticut</u>, 401 U.S. 371, 379, 91 S. Ct. 780 (1971) ("What the Constitution does require is 'an opportunity . . . granted at a meaningful time and in a meaningful manner,' for [a] hearing appropriate to the nature of the case.'") (internal citations omitted); <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552, 85 S. Ct. 1187 (1965) ("A fundamental requirement of due process is 'the opportunity to be heard' . . . at a meaningful time and in a meaningful manner.") (internal citations omitted).  In the present case, both the sufficiency of the notice and the adequacy of the opportunity to be heard are implicated, and both have been addressed by the Ninth Circuit.

This court has held, regarding the substance of the notice required prior to a pre-termination hearing:

> On the issue of notice, the court in <u>Matthews v. Harney County School Dist.</u>, 819 F.2d 889, 892 (9th Cir. 1987), read <u>Loudermill</u> to require, in advance of any pre-termination hearing, 1) notice to the employee as to the pendency or contemplation of a dismissal action, and 2) notice as to the charges <u>and</u> evidence which gave rise to that concern.

<u>Adams v. School Dist.</u>, 699 F. Supp. 243, 246 (D. Or. 1988) (emphasis added).  <u>See also</u> <u>Connell v. Multnomah County et al.</u>, 2003 US Dist LEXIS 8145 at 10 (D. Or. 2003).

PAGE 10 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Even if the notice may be substantively sufficient, due process requires that the hearing must also accord the person a meaningful opportunity to be heard.  "Due process of law [is not present] where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard."  Washington v. Kirksey, 811 F.2d 561, 564 (11th Cir. 1987) (quoted in Matthews, 819 F.2d at 893-94).  To insure that the hearing is meaningful, for example, the notice must be provided sufficiently far in advance so as to provide sufficient time to prepare for the hearing.  Failure to do so does deprives the employee of a "meaningful" opportunity to respond to the allegations.  Brady v. Gebbie, 859 F.2d 1543, 1554-55 (9th Cir. 1988); In re Adoption of Olopai, 1990 U.S. Dist. LEXIS 7272 at 9 (D. N. Mar. I. 1990) ("three  days was insufficient time to prepare for the hearing.").

Similarly, a hearing "is totally devoid of a meaningful opportunity to be heard," and therefore does not comport with due process, if the decision-makers have predetermined the outcome of the hearing.  Matthews, 819 F.2d at 893-94 (quoting Washington v. Kirksey, 811 F.2d 561, 564 (11th Cir. 1987)); see also Brady, 859 F.2d at 1554-55 (jury could infer prejudgment from comments like: "I don't know what in heaven's name you can tell me, Bill, that would make me change my mind."); Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) ("Certainly, a body that has prejudged the outcome cannot render a decision that comports with due process.").

Plaintiff submits that the flawed, accusatory process that occurred, as described supra, where plaintiff – a fully tenured professor – was not even allowed to read a written explanation of the allegations against him before being terminated – did not meet these fundamental requirements.  Plaintiff should be allowed to present these arguments and evidence to a jury.

PAGE 11 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

**DEFENDANTS MISUNDERSTAND THE BROADER NATURE OF THE
PROCEDURAL DUE PROCESS CLAIM**

Defendants focus on the process that was provided during the investigation. However, in

the context of a union employee, who can be terminated only for "good cause," the appropriate

test takes into account whether the employee was put on notice <u>before</u> the proscribed behavior

took place, that he or she could be terminated for that behavior. The full seven-part test used for

union employees is as follows:

1. Did the employer give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?

2. Was the employer's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the employer's business and (b) the performance that the employer might properly expect of the employee?

3. Did the employer, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?

4. Was the employer's investigation conducted fairly and objectively?

5. At the investigation did the "judge" obtain substantial evidence or proof that the employee was guilty as charged?

6. Has the employer applied its rules, orders, and penalties evenhandedly and without discrimination to all employees?

7. Was the degree of discipline administered by the employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the record of the employee in his service with the employer?

<u>Enterprise Wire Co.</u>, 46 Labor Arb. Reptr (BNA) 359, 362 (1966) (attached to Dugan Decl. as

Exhibit E. All tests must be met for "good cause" to be satisfied for a union employee.

The first test was not met here. As explained <u>supra</u>, in deciding to terminate Dr. Pavel,

the investigators relied heavily on finding a "pattern" of misbehavior, despite not documenting

any prior discipline in his personnel file and no discipline having been issued.

Furthermore, there was absolutely no precedent in terminating a tenured University of Oregon professor for <u>any</u> reason in the past.

In orally discussing with Dr. Pavel the graduate student's complaint, the University did not explain to Dr. Pavel that any specific conduct would lead to his termination.

Nor does the harassment training he received outline any specific behavior that would lead to termination.

Nor does the CBA explain that certain specific behavior would lead to termination.

These facts demonstrate that the employer did not "give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct."

For similar reasons, test # 6 is not met – "Has the employer applied its rules, orders, and penalties evenhandedly and without discrimination to all employees?"  It stretches credulity to believe that Dr. Pavel is the very first tenured professor to be accused of sexual harassment, with such accusations being upheld.  Yet no other tenured professor has ever been terminated involuntarily.

**CONCLUSION**

There are sufficient disputed issues of material fact on both procedural and substantive due process to go to the finder of fact.  The motion for summary judgment should be denied.

Respectfully submitted February 13, 2017.

    /s/   Marianne Dugan    
Marianne Dugan, OSB # 932563
Attorney for Plaintiff
259 E. 5th Ave., Ste 200-D

PAGE 13 - PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Eugene, Oregon 97401
(541) 338-7072