Marianne Dugan (OSB # 932563)
Internet e-mail address mdugan@mdugan.com
259 E. 5th Ave., Suite 200-D
Eugene, OR 97401
(541) 338-7072
Fax no. 866-650-5213
          Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

CHIXAPKAID DONALD MICHAEL PAVEL,

          Plaintiff,

          v.

UNIVERSITY OF OREGON; DOUG BLANDY;
PENELOPE DAUGHERTY; ANNIE BENTZ;
RANDY KAMPHAUS; JULIET A. BAXTER;
JANNE UNDERRINER; JASON YOUNKER; and
BRIAN KLOPOTEK,

          Defendants.

No. 6:16-CV-00819-AA

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT

          ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.  LEGAL STANDARDS APPLICABLE TO SUMMARY JUDGMENT MOTIONS IN
    EMPLOYMENT DISCRIMINATION CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  MATERIAL UNDISPUTED AND DISPUTED FACTS REGARDING PLAINTIFF'S
     DISPARATE TREATMENT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Dr. Pavel Belongs to a Protected Class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  Dr. Pavel Was Performing According to His Employer's Legitimate
        Expectations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.  Dr. Pavel Suffered an Adverse Employment Action . . . . . . . . . . . . . . . . . . . . . . . 5

    D.  Similarly Situated Employees Were Treated More Favorably, or Other
        Circumstances Surrounding the Adverse Employment Action Give Rise to an
        Inference of Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  Similarly situated employees were treated more favorably . . . . . . . . . . . 6

        2.  Other circumstances surrounding the adverse employment action give rise
            to an inference of discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            a.  The investigation was unreasonably hostile and pre-judged . . . . . 8

            b.  The investigation was tainted by animus on the part of
                colleagues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  MATERIAL DISPUTED AND UNDISPUTED ISSUES OF FACT REGARDING THE
      FIRST AMENDMENT RETALIATION CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.  IF THE BURDEN SHIFTS BACK TO PLAINTIFF, HE HAS PRESENTED
     SUFFICIENT EVIDENCE FOR A JURY TO INFER THAT THE EMPLOYER'S
     REASONS FOR TERMINATING HIM WERE PRETEXTUAL . . . . . . . . . . . . . . . . . . 21

V.  AN AWARD OF FEES WOULD NOT BE APPROPRIATE  . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## CASES

Bass v. Bd. of County Comm'rs, 256 F.3d 1095 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 4, 22

Bell v. Clackamas County, 341 F.3d 858 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Braxton-Secret v. Robins Co., 769 F.2d 528 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Carter v. Univ. of Toledo, 349 F.3d 269 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S. Ct. 694 (1978) . . . . . . . . . . . . . . . 23

Chuang v. Univ. of Cal. Davis, 225 F.3d 1115 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . 2

Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 1

Dooley v. Reiss, 736 F.2d 1392 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Eng v. Cooley, 552 F.3d 1062 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840 (9th Cir. 2004) . . . . . . . . . . . . . 4

Garrett v. Hewlett-Packard Co., 305 F.3d 1210 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 4, 22

Gerdom v. Cont'l Airlines, Inc., 692 F.2d 602 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Giacoletto v. Amax Zinc Co., 954 F.2d 424 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

Gilbrook v. City of Westminster, 177 F.3d 839 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 4

Godwin v. Hunt Wesson, Inc., 150 F.3d 1217 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Hawn v. Exec. Jet Mgmt, Inc., 615 F.3d 1151 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Hernandez v. Spacelabs, 343 F.3d 1107 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Hudson v. Western Airlines, Inc., 851 F.2d 261 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 23

Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Karam v. City of Burbank, 352 F.3d 1188 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741 (9th Cir. 2001) . . . . . . . . . . . . . . . 3

Maag v. Wessler, 993 F.2d 718 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

McCarthy v. Mayo, 827 F.2d 1310 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

McConnell v. Critchlow, 661 F.2d 116 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973) . . . . . . . 1, 2, 3, 4, 5, 21

McGinest v. GTE Serv. Corp., 360 F.3d 1103 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Metoyer v. Chassman, 504 F.3d 919 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283 (9th Cir. 1999) . . . . 2-3

Miller v. Fairchild Indus., Inc., 797 F.2d 727 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Mitchell v. Los Angeles Community College Dist., 861 F.2d 198 (9th Cir. 1988) . . . . . . . . 23, 24

Piva v. Xerox Corp., 654 F.2d 591 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Porter v. Calif. Dept of Corrections, 419 F.3d 885 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 4, 22

Reynaga v. Roseburg Forest Products, 847 F.3d 678 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . 2, 6

Rogers v. Missouri Pacific R. Co., 352 U.S. 500 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Russell v. TG Mo. Corp., 340 F.3d 735 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 3

Schwartzman v. Valenzuela, 846 F.2d 1209 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Sischo-Nownejad v. Merced Cmty Coll. Dist., 934 F.2d 1104 (9th Cir. 1991) . . . . . . . . . . . . . . 2

Staub v. Proctor Hosp., 562 U.S. 411, 131 S. Ct. 1186 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . 16

Stegall v. Citadel Broadcasting, 350 F.3d 1061 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 3

Stern v. Trs. of Columbia Univ., 131 F.3d 305 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981) . . . . . . . . . . . . . . 2

Thomas v. City of Tacoma, 410 F.3d 644 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 1

Walls v. J.R. Simplot Co., 26 F.3d 885 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Winarto v. Toshiba Am. Elecs Components, Inc., 274 F.3d 1276 (9th Cir. 2001) . . . . . . . . . 3, 4

Yartzoff v. Thomas, 809 F.2d 1371 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATUTES**

42 U.S.C. 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**OTHER AUTHORITIES**

B. Schlei & P. Grossman, Employment Discrimination Law 314 (Supp. 1979) . . . . . . . . . . . . 21

Plaintiff responds in opposition to defendants' motion for partial summary judgment.

## I. LEGAL STANDARDS APPLICABLE TO SUMMARY JUDGMENT MOTIONS IN EMPLOYMENT DISCRIMINATION CASES

A plaintiff alleging employment discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry -- one that is most appropriately conducted by a factfinder, upon a full record." Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1124 (9th Cir. 2000) (internal quotation marks omitted). "In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004).

"[U]nder the McDonnell Douglas framework, '[t]he requisite degree of proof necessary to establish a prima facie case for Title VII discrimination does not even need to rise to the level of a preponderance of the evidence.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002) (quoting Walls v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)). See also Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008) ("As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment.").

The Ninth Circuit has also noted that the evidence of discriminatory animus will almost always be circumstantial, because "[d]efendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is

PAGE 1 - PLAINTIFF'S RESP. TO DEFS' SECOND MOTION FOR SUMMARY JUDGMENT

not contradicted by known direct evidence." <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1028 (9th Cir. 2006). Indeed, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." <u>Rogers v. Missouri Pacific R. Co.</u>, 352 U.S. 500, 508 n.17 (1957).

As the Ninth Circuit noted in <u>Mendocino Environmental Center v. Mendocino County</u>:

Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action. . . . Moreover, [q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." <u>Braxton-Secret v. Robins Co.</u>, 769 F.2d 528, 531 (9th Cir. 1985).

192 F.3d 1283, 1302 (9th Cir. 1999).

The Ninth Circuit this year recently reiterated the appropriate (alternative) tests for hostile work environment, in <u>Reynaga v. Roseburg Forest Products</u>:

To show a *prima facie* case of disparate treatment, a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." <u>Sischo-Nownejad v. Merced Cmty Coll. Dist.</u>, 934 F.2d 1104, 1110 (9th Cir. 1991) (quoting <u>Tex. Dep't of Cmty Affairs v. Burdine</u>, 450 U.S. 248, 250, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). One way to establish an inference of discrimination is by satisfying the *prima facie* elements from <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973):

(1) the plaintiff belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. <u>Hawn v. Exec. Jet Mgmt, Inc.</u>, 615 F.3d 1151, 1156 (9th Cir. 2010); <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S. Ct. 1817).

Under the <u>McDonnell Douglas</u> burden-shifting framework, when the plaintiff demonstrates his *prima facie* case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. <u>Hawn</u>, 615 F.3d at 1155. If the defendant meets this burden, then the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere

pretext for unlawful discrimination."  Id.

However, nothing compels the parties to use the <u>McDonnell Douglas</u> framework. <u>McGinest</u>, 360 F.3d at 1122.  In the alternative, a plaintiff may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason "more likely than not motivated" the employer.  <u>Metoyer v. Chassman</u>, 504 F.3d 919, 931 (9th Cir. 2007) (citation omitted); <u>see also</u> <u>Hawn</u>, 615 F.3d at 1155 (explaining that a plaintiff may show an inference of discrimination "through comparison to similarly situated individuals, or any other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination") (internal quotation marks and citation omitted).  Either way, we require "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry-one that is most appropriately conducted by the factfinder, upon a full record." <u>Schnidrig v. Columbia Mach., Inc.</u>, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation marks and citation omitted).

847 F.3d 678, 690-91 (9th Cir. 2017).

As for the First Amendment retaliation claim, some of the types of circumstantial evidence the courts have held will permit an inference of retaliation sufficient to deny summary judgment are:

- **Proximity in time and the chronology of events** – especially a period of satisfactory relationships with the defendant that deteriorates after the plaintiff has filed a lawsuit or undertaken other protected activity.  "[P]roximity in time between the protected action and the allegedly retaliatory employment decision [i]s one [way] a jury logically could infer [that the plaintiff] was terminated in retaliation." <u>Keyser v. Sacramento City Unified Sch. Dist.</u>, 265 F.3d 741, 751-52 (9th Cir. 2001).  In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext.  <u>See</u> <u>Bell v. Clackamas County</u>, 341 F.3d 858, 865-66 (9th Cir. 2003) (temporal proximity provides circumstantial evidence, as does the negative change in evaluations over time); <u>Miller v. Fairchild Indus., Inc.</u>, 797 F.2d 727, 731-32 (9th Cir. 1986); <u>Schwartzman v. Valenzuela</u>, 846 F.2d 1209, 1212 (9th Cir. 1988) (plaintiff employee had received good evaluations until he began criticizing his employer's procedures publicly); <u>Winarto v. Toshiba Am. Elecs Components, Inc.</u>, 274 F.3d 1276, 1287 n.10 (9th Cir. 2001) (plaintiff's complaints, which closely preceded reduction in her performance review scores and a labeling of her as not a "team player," supported a reasonable inference that defendant acted with a retaliatory motive); <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient evidence of causation existed where adverse actions occurred less than three months after complaint was filed, two weeks after charge first investigated, and less than two months after investigation ended); <u>Stegall v. Citadel Broadcasting</u>, 350 F.3d 1061 (9th Cir.

2003); Hernandez v. Spacelabs, 343 F.3d 1107 (9th Cir. 2003).

  **- Statements of hostility or ill-will towards the plaintiff.** Gilbrook v. City of Westminster, 177 F.3d 839, 857 (9th Cir. 1999); Bell v. Clackamas County, 341 F.3d 858 (9th Cir. 2003) (mean looks); Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1287 n.10 (9th Cir. 2001) ("exasperation," "lack of sympathy" as circumstantial evidence); Porter v. Calif. Dept of Corrections, 419 F.3d 885 (9th Cir. 2005) ("not for you" sneers; spitting in food; glaring); Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840 (9th Cir. 2004) (e.g. mocking of accents); Chuang v. Univ. of California Davis, Bd. of Trs., 225 F.3d 1115 (9th Cir. 2000); Carter v. Univ. of Toledo, 349 F.3d 269 (6th Cir. 2003) (administrator's comments about racial discrimination were admissible even though speaker was not decisionmaker).

  **- Deviation from policy.** Porter v. Calif. Dept of Corrections, 419 F.3d 885 (9th Cir. 2005) (deviation, including coworker's suspicion of harassment before plaintiff even complained is evidence of pretext); Giacoletto v. Amax Zinc Co., 954 F.2d 424, 427 (7th Cir. 1992) ("The jury could reasonably have concluded that because Amax neglected to follow [its] procedures for helping employees to overcome their deficiencies, the company had fired Giacoletto not because of his asserted deficiencies, but to retaliate [against him]"); Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1220 (10th Cir. 2002) (holding that deviations from an employer's regular procedures established pretext); see also Russell v. TG Mo. Corp., 340 F.3d 735, 746 (8th Cir. 2003) ("We agree . . . that an employer's deviation from its own policies can, in some instances, provide evidence of pretext"); Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1108 (11th Cir. 2001) ("An employer's violation of its own normal hiring procedure [was] evidence of pretext"); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) (reiterating that an employer's departure from regular procedures can be indicative of pretext).

## II.   MATERIAL UNDISPUTED AND DISPUTED FACTS REGARDING PLAINTIFF'S DISPARATE TREATMENT CLAIMS

  The University's treatment of Dr. Pavel in its investigation was biased from the start, presuming he was guilty as charged. The manner in which the employer treats the employee may suffice to demonstrate discriminatory disparate treatment. McDonnell Douglas, 411 U.S. at 804-05, 93 S. Ct. 1817.

  In addition, as will be explained in more detail below, Dr. Pavel – the senior Native American faculty at the University of Oregon and the only Native American full professor at the University (Pavel Decl. ¶ 2) – was the very first tenured professor to be terminated by the

University in response to a sexual harassment complaint. Differential treatment compared to others similarly situated outside one's protected class can also demonstrate discrimination. Id.

**A.      Dr. Pavel Belongs to a Protected Class**

It is undisputed that Dr. Pavel is Native American and therefore is in a protected class.

**B.      Dr. Pavel Was Performing According to His Employer's Legitimate Expectations**

It appears to be undisputed that, other than the alleged sexual harassment, Dr. Pavel met his employer's expectations. Until January 21, 2015, Dr. Pavel was a full professor at the University of Oregon. Full professor status requires a strong showing of productivity as a scholar; engagement as an instructor; and commitment of service to the community. Pavel Decl. ¶ 2. Dr. Pavel was an award–winning, nationally renowned scholar in his field of study and had received many honors as a distinguished professor. Id. He was chosen by the American Educational Research Association (AERA) for an award. He was performing at his highest level. His student evaluations were off the chart positive. Exhibit E (evaluations); Exhibit F (RateMyProfessor.com). His teaching, research (publications and scholarship), and service were stellar, and his annual reviews reflected this. Exhibit G. He received a merit pay increase from $109,000 to $113,000 annual salary. Pavel Decl. ¶ 2.

**C.      Dr. Pavel Suffered an Adverse Employment Action**

It is undisputed that Dr. Pavel's termination was an adverse employment action.

**D.      Similarly Situated Employees Were Treated More Favorably, or Other Circumstances Surrounding the Adverse Employment Action Give Rise to an Inference of Discrimination**

The McDonnell-Douglas analysis makes clear these are two different ways of demonstrating a *prima facie* case. Dr. Pavel presents evidence for both prongs.

**1.      Similarly situated employees were treated more favorably**

Defendants Blandy (Senior Vice Provost for Academic Affairs) and Daugherty (then head of Affirmative Action/Equal Opportunity) both testified that they knew of no tenured professors ever terminated involuntarily, for any reason.  Dugan Decl. Exhibit C (Blandy Tr. at 15-16, 23-38); Exhibit D (Daugherty Tr. at 40-44).

In discovery, the University provided a list of "all tenured professors who have received complaints regarding sexual harassment  in the past ten years," with the results of the investigations.  Exhibit H.  The list compiled by the University contains the names of nineteen tenured professors besides Dr. Pavel.  Although the statistical pool is relatively small, in the 2017 Ninth Circuit Reynaga case the Court found sufficient a single comparator – the comparison between Mr. Reynaga and his Caucasian tormenter, who was not disciplined in any way.

Eighteen of the other nineteen professors on the list are male.  Dugan Decl.  Three of them had more than one sexual harassment complaint against them.  Of those three, two of the complaints were sustained, but both of those professors received only a written reprimand after the second complaint.  One of those reprimands was expunged following a grievance.

For two other professors, the complaints were determined to be founded ("Cause"), both in 2016.  Yet one of those lists no discipline, and the other received discipline of only one term of suspension without pay.  The one with no discipline in fact was given the opportunity to retire rather than be terminated.  He had been accused of sexual harassment by no less than five students, two of whom filed formal complaints.  There was also evidence he had retaliated against students for complaining about the harassment.  The accusations included inappropriate

touching of students' breasts, and legs.  Ex. I at 75, 76-77, 78, 79, 84, 87, 90, 91, 92, 93, 94, 95.

Of the fourteen other professors, four were found to be "no cause" (complaint not sustained).

The others (including the complaint against the one female professor) were resolved through "informal resolution," with no discipline imposed.

The imposition of the harshest discipline – which was imposed upon Dr. Pavel – termination of a full professor with no opportunity to resign in lieu of termination – was unprecedented.  The Collective Bargaining Agreement (CBA) promises that "[d]iscipline will be administered in a progressive manner," with several types of discipline being listed, including written reprimand; demotion; loss of or reduction in benefits; suspension with or without pay of various lengths; reduction of perquisites or salary; and loss of tenure.  Exhibit B at 2-3.

As noted supra, plaintiff was the only Native American full professor at the University of Oregon and he was the senior Native American professor at the time of his termination.  None of the other nineteen other tenured professors on the list are Native American.  Dugan Decl.  Of the three professors who were disciplined (although not terminated), one is African-American; one is Asian-American; and one is Filipino.  Dugan Decl.  The one professor who had a complaint for "cause" but was allowed to retire instead of being fired appears from his University website photograph to be Caucasian.  Id.  Of the other fifteen professors (all of whom who received no discipline), all but one appear from their University website photographs to be Caucasian.  The complaint against the professor who appears to be non-Caucasian was not sustained.

Other than the professor with five complainants, who was allowed to retire instead of be fired, there is little information for most of the complaints other than a single sheet of paper with

very basic information.

However, the complaint against the female professor alleged that she had ripped open her blouse in class and also had flirted with a student.  Ex. I at 4.  No discipline was imposed; only an "informal resolution" concluding "I am sure that your perception of these events is very different than the students. We bring them to your attention so that you will be aware of the complaints and be able to take actions to avoid problems in the future."  Id.

The other complaints which do have details include touching the front pocket of a student's sweater and commenting on its softness (Ex. I at 32); and touching a student's hips, telling her she was beautiful, and indicating he wanted to go out with her (Ex. I at 37-38).  Both of those also resulted in similar "informal resolution" and no discipline.  Ex. I at 33-34, 39.

**2.      Other circumstances surrounding the adverse employment action give rise to an inference of discrimination**

The hostile, pre-judged treatment of Dr. Pavel during the investigation provides additional support for his claims that would allow a jury to infer that his termination was discriminatory.

**a.      The investigation was unreasonably hostile and pre-judged**

Dr. Pavel learned November 21, 2014, that he had been accused of sexual harassment by a female undergraduate student, and was being placed on administrative leave. Id. ¶ 3.  On December 18, 2014, he attended a meeting with Affirmative Action/Equal Opportunity investigators Penny Daugherty and Anne Bonner; and the Union Grievance Chair, Debra Merskin.  Id. ¶ 4.  That meeting started with a flurry of policy documents shoved towards Dr. Pavel, one after the other, to the extent where even Ms. Bonner was confused about which policy she was talking about.  The documents were actually being thrown at him, with no time allowed

for him to review or digest them.  The hostility from the investigators was clear from the start.  Id. ¶ 5.  Any attempt at an answer from Dr. Pavel was cut off.

At that meeting the investigators were focused on an alleged "pattern" of behavior.  Id. ¶ 6.  At some point during the meeting Dr. Pavel heard something along the lines of, "this investigation will find other instances, to establish a pattern.  We're going to find a pattern; you might as well admit it."  They demanded he admit things he had not done, with only vague explanations of what he was being accused of.  He was in shock.  That went on for thirty or forty minutes.  Pavel Decl. ¶ 6.  Even though Ms. Bonner said she was to lead the meeting, Ms. Daugherty kept inserting her own comments, directed Ms. Bonner on what she could and could not do, and brought up an alleged past incident with a female graduate student and vaguely alluded to other alleged past incidents, without stating any details or providing any opportunity to Dr. Pavel to respond to those allusions during the meeting.

Until this lawsuit was filed, no one ever provided Dr. Pavel with any written documentation of what the female undergraduate student accused him of doing.  Id. ¶ 7.  Information Dr. Pavel and his Union requested was not provided to him.  The attorney handling his grievance on behalf of the Union did finally obtain some of the requested information but was not allowed to share it with Dr. Pavel.  Even his request to see the police report, which had already been released to the media, was denied.  Pavel Decl. ¶ 7.

Finally the investigators said, "You can speak."  Id ¶ 8.  Dr. Pavel asked whether he had a right to see a copy of these allegations and what the student had said.  They said, "Yes, you do."  They said they would send it to the Union for him.  Afterwards, however, Ms. Daugherty sent an email that said they would not give Dr. Pavel anything in writing but would orally tell him the

allegations, which is what they had already done.  Id.

Dr. Pavel did deny the allegations, as they were untrue, but without written explanation of the allegations against him he did not feel able to meaningfully respond to the allegations.  Id. ¶ 9.  See also Merskin Decl.

The event at which the harassment was alleged to have taken place was not a University-sponsored event.  It was held at the Portland Art Museum.  Pavel Decl. ¶ 11.  Dr. Pavel was at all times in a public place, with people passing by as he spoke to the student about concerns she was having regarding how she was faring as a freshman.  Using methods traditional to his culture, he told her to look in the museum's hallway mirror and reflect upon how competent and beautiful she was.  She revealed that she was going out with a young white man and was worried about how her parents would take that news.  At no time did Dr. Pavel inappropriately touch her.

There was exculpatory evidence that was not reviewed by the University – for example, as detailed infra, the University did not interview other non-students who were present at the Portland Art Museum event, and it appears the University did not review the Museum's cameras to see if the video corroborated the student's allegations.  The University also appears to have tried to drum up other complaints about Dr. Pavel, despite the fact that the allegations that emerged had never been documented in the past nor brought to Dr. Pavel's attention in a disciplinary context.

There was a second meeting on January 16, 2015, between Doug Blandy (Senior Vice Provost for Academic Affairs); Randy Kamphaus (Dean of the College of Education); Bill Brady (University of Oregon Senior Director of Employment and Labor Relations), Dave Cecil (head of the Union), Debra Merskin; and Dr. Pavel, at which he was told that in two working days he

would be terminated.  Dr. Pavel was not given any indication prior to this meeting that he would be terminated.  Pavel Decl. ¶ 10; Merskin Decl. ¶ 5.

As discussed in further detail *supra*, no University of Oregon tenured professor had ever before been terminated for sexual harassment.  Indeed, neither Dr. Pavel nor Debra Merskin nor defendants Blandy (Senior Vice Provost for Academic Affairs) and Daugherty (then head of Affirmative Action/Equal Opportunity) were aware of any University of Oregon tenured professors ever terminated involuntarily, for any reason.  Dugan Decl. Exhibit C (Blandy Tr. at 15-16, 23-38); Exhibit D (Daugherty Tr. at 40-44); Merskin Decl. ¶ 6.

The Collective Bargaining Agreement (CBA) promises that "[d]iscipline will be administered in a progressive manner," with several types of discipline being listed, including written reprimand; demotion; loss of or reduction in benefits; suspension with or without pay of various lengths; reduction of perquisites or salary; and loss of tenure.  Exhibit B at 2-3.  The CBA does state that some behavior is severe enough to warrant immediate termination, but neither the CBA nor any information ever given to Dr. Pavel warned him that he faced immediate termination based on a single formal complaint of sexual harassment.  Pavel Decl. ¶ 12.  The decision to terminate Dr. Pavel was entirely unprecedented and unexpected.

Dr. Pavel thought there would be a conversation and the opportunity to speak for himself at the January 2015 meeting.  Pavel Decl. ¶ 13.  Instead, he was simply told the university has a zero tolerance policy on these matters and that he was terminated, with no reconsideration possible.  Id.; Merskin Decl. ¶ 7.

After its investigation lasting over two months, defendants gave Dr. Pavel only one business day (Friday January 16 to Tuesday, January 20, 2015, with January 19 being Martin

Luther King Day) to provide a written statement challenging the termination action and to provide any additional evidence he believed was relevant to its action. Pavel Decl. ¶ 14.

The investigative report went to great lengths to excuse (in footnotes) all of the complaining student's factual inconsistencies. Exhibit A at 29-30. In contrast, the report inserts odd editorializing about Dr. Pavel in footnotes, such as: "While his phone message to Johnson on Sunday appears to corroborate his version of events, CHiXapkaid also had the opportunity to plan what he was going to say, before he left the message." Id. at 29 n. 25. "CHiXapkaid's report of concerns about appearances is also weakened by observations widely shared by interviewees, which support an understanding that ChiXapkaid has often demonstrated little concern for following norms." Id. n. 26.

The investigative report makes clear that the investigator did not bother to review or obtain key text messages from the complaining student's phone, until much later when she had already deleted them. Exhibit A at 12 n. 11. Nor did the investigator bother trying to locate the other students who were with the complaining student at the museum event. Id. at 18 n. 18. Nor did the investigator review security video from the event before it was overwritten. Id. at 22 n. 23.

Nor was there a documented pattern of harassment that the University has sought to depict. At some point in the past (likely in 2012), Mia Tuan and Jerry Rosiek from Dr. Pavel's Department had spoken to him about a female graduate student's allegations about him. Pavel Decl. ¶ 15. They told him it was "informal," and never stated they were disciplining him nor that they were substantiating a complaint. This was not documented in writing and there is nothing in Dr. Pavel's personnel file about their conversation with him. They told Dr. Pavel there had

been an anonymous complaint.  Id.  At no time did Dr. Pavel touch the female graduate student or make any verbal or physical suggestions or gestures of romantic or sexual involvement.  Id. ¶ 16.

Dr. Tuan and Dr. Rosiek did not give Dr. Pavel any sort of warning as to any particular type of behavior and did not tell him he was being disciplined.  Id. ¶ 17.  Similarly, when Annie Bentz from AA/EO spoke with Dr. Pavel about that same graduate student's allegations, she did not tell him it was an investigation nor did she invite him to give his statement as to what happened.  She did not give him any sort of warning as to any particular type of behavior and did not tell him he was being disciplined.  Id.

At some point in the past Jill Baxter (then Department Head of the Education Studies) told Dr. Pavel she wanted to talk to him about a complaint by a male student.  Id. ¶ 18.  She did not clarify what the complaint was about, and she told Dr. Pavel she did not want him to worry about it.  Later another colleague told Dr. Pavel he was told that the student had complained about him as well, and that the complaints were found to be unsustained.  No response was requested from Dr. Pavel and no details were ever given to him.  Id.

There is nothing in Dr. Pavel's personnel file that mentions the alleged complaints from the female graduate student and the male student.  Pavel Decl. ¶ 19.  Nor is there any other complaint or discipline of any sort in his personnel file (other than the undergraduate student's complaint that triggered his termination).  Id.  The CBA states that oral reprimands do not constitute discipline.  Exhibit B at 2-3.

### b.     The investigation was tainted by animus on the part of colleagues

It was not until after Dr. Pavel filed this lawsuit that he learned that one or more people at

the University had circulated rumors of sexual harassment against him, and he was not given any opportunity to respond to these baseless rumors.  Pavel Decl. ¶ 20.  He has since learned through the discovery process that the rumors originated in large part from his distant cousin, who had had unpleasant interactions with Dr. Pavel over the years, and whose doctoral work Dr. Pavel had criticized when Dr. Pavel was for a period of time on that student's doctoral committee.  Id. The discovery process has revealed that this student's complaints wildly inconsistent and exaggerated complaints made it all the way to defendant Blandy (Senior Vice Provost for Academic Affairs) and the Academic Affairs Council.  Exhibits J, K, L, M, N, O.  The University's documentation regarding this student's complaints about Dr. Pavel concludes: "Followup did not yield supporting information."  Exhibit H.

This disgruntled student (who lost a succession of doctoral committee members, alienating almost every professor in the department) has been close over the years to the father of the student who accused Dr. Pavel of sexual harassment.  Pavel Decl. ¶ 21.  Years earlier, Dr. Pavel and the father had had a falling out over matters of tribal identity and related issues.  Id.

The fact that the University chose to give any credence to the disgruntled student's wild allegations about Dr. Pavel is further evidence that the University pre-judged Dr. Pavel and did not conduct a fair investigation – especially in comparison to the other tenured professors with sexual harassment complaints.

Janne Underriner was (and is) the University's Director of the Northwest Indian Language Institute (NILI).  Dr. Underriner (who is not Native American) is also a longtime friend of the family of the freshman student who alleged that Dr. Pavel sexually harassed her. Pavel Decl. ¶ 22.  In addition, the student's father was (and is) on the Advisory Board of NILI,

and has known Dr. Underriner for twenty years.  Exhibit A at 5, 22.  The University first learned

of the student's allegations when the father told Dr. Underriner of the allegations.  Id.

Ms Underriner immediately became a moving force in getting the University to pursue an

investigation against Dr. Pavel.  Exhibit A at 5, 6, 8, 10, 12, 22-23, 26.  She accompanied the

complaining student to the police department; and the student stayed at her home after

complaining.  Id. at 23, 49.  During that police interview, she stated that she had been told by

someone never to be alone in a room with Dr. Pavel.  Ex. A at 49; Ex. S.  She responded to the

University's investigator's questions about the tribal connections between the student and Dr.

Pavel – much of which information was false.  For example, she stated that Dr. Pavel was in the

same smokehouse as the student, implying an unusually close position of confidence between

them; but she was in fact not in his smokehouse.  Ex. A at 12 n. 14; Pavel Decl. ¶ 23.  A

reasonable jury could find that Dr. Underriner's animus towards Dr. Pavel tainted the

investigation.

Dr. Underriner and Dr. Pavel had previously had several disagreements.  In the 2010-11

school year, Dr. Underriner proposed that graduate students from the Linguistics program be

given teaching certificates, which would have been special treatment compared to the other

students.  Pavel Decl. ¶ 24.  Dr. Pavel opposed that, and said it was not possible, because

everyone had to go through the established processes of testing and applying for the certificate.

Dr. Underriner expressed that she was unhappy about his response, and that she perceived him as

part of the bureaucracy standing in the way of getting language teachers in the schools.

For the Summer of 2011 Dr. Pavel planned a summer program called Honoring Tribal

Legacy, to work on curriculum development.  Pavel Decl. ¶ 25.  His program conflicted in time

and location with Dr. Underriner's established summer institute, NILI (Northwest Indian Language Institute). The father of the complaining student is on the Board of NILI. Dr. Underriner was upset that Dr. Pavel was scheduling something that conflicted with her program. They were not able to resolve that problem. The people attending Dr. Pavel's workshop were not able to attend the Institute. Even Dr. Pavel's attempts to have a joint meal between the two programs were unsuccessful. Dr. Underriner took it as an affront.

Dr. Pavel also told Dr. Underriner he felt she should be training indigenous people to do the Institute. Pavel Decl. ¶ 26. He told her that she should really should be training a Native American person to be the director of the Native Language Institute; and that they should all be training themselves out of their jobs, looking for the next generation of native people to take over the programs. She was not receptive to that idea, and retorted "I should be replaced by an Indian?" Dr. Pavel responded that she should be training the next generation of educators.

These conflicts with Dr. Underriner were not taken well by Dr. Underriner, and she repeatedly expressed unhappiness with him over these issues. In particular, his repeated confrontation with her regarding the fact that she was a non-Native American running a Native American language program was not taken well by her.

As the Supreme Court noted in <u>Staub v. Proctor Hosp.</u>, 562 U.S. 411, 131 S. Ct. 1186 (2011), an employer can be held liable for discriminatory conduct when an unbiased H.R. director fires an employee for seemingly legitimate reasons, if a manager motivated by discriminatory motives set the termination process in motion. The Court concluded that even if the HR director conducts an independent investigation, if the termination takes into account the biased supervisor's statements, a jury can permissibly find that the termination was tainted by the

underlying discrimination.

The police report states that Underriner told the police that someone told her never to be in the same room with Dr. Pavel, and, even before the investigation was concluded, this statement was provided by the University to the Eugene Register-Guard. Exhibit S. This underscores the problems with the investigation that were created by allowing rumor and innuendo to infect the process.

The evidence presents material issues of disputed fact regarding the discriminatory nature of the way in which Dr. Pavel was treated, especially in comparison with the nineteen other tenured professors who had sexual harassment complaints filed against them. Summary judgment should be denied.

## III. MATERIAL DISPUTED AND UNDISPUTED ISSUES OF FACT REGARDING THE FIRST AMENDMENT RETALIATION CLAIM

The Ninth Circuit applies a five-step analysis to First Amendment retaliation claims: the plaintiff must first establish that (1) he spoke on a matter of public concern, (2) he spoke as a private citizen and not as a public employee, and (3) his protected speech was a substantial or motivating factor in an adverse employment action. The burden then shifts to the defendant, which can avoid liability by showing *either* that (4) a legitimate administrative interest outweighed the employee's right to free speech or (5) the defendant would have taken the adverse employment action even absent the protected speech. Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009).

Dr. Pavel spoke out against the firing of Professor Thomas Ball (a Native American) by

the University, under the authority of Vice President Yvette Alex-Assensoh.  Pavel Decl ¶¶ 28-32; Exhibit P.  Dr. Ball was the designated liaison for Native American students.  Pavel Decl ¶ 28.  Two years after Dr. Ball and the two other minority liaisons were fired – three months before Dr. Pavel was investigated for the alleged sexual harassment – Jason Younker was finally hired in a position that was created as a replacement for Dr. Ball's position.  Id.  As explained *infra*, upon his hiring Dr. Younker engaged in discussion with Dr. Pavel about Dr. Ball's firing, and Dr. Pavel continued to express his concerns and recommendations regarding how Dr. Ball's firing should be addressed, as those concerns on the part of the Native American community had not dissipated.

The University claimed Dr. Ball's firing was due to the restructuring of the Office of Equity and Inclusion.  Dr. Pavel expressed his opinion that the University was making a serious mistake, and that the decision for him called into question the quality of the University's decision-making.  Pavel Decl ¶ 29.  He noted the many great contributions of Dr. Ball.  At the same time Dr. Ball was terminated, the University also terminated the liaisons for African-American and Hispanic students, which was disturbing and caused a significant outcry among the students and faculty, as well as in the Eugene community, as noted in the local news coverage as well as the UO Matters Blog.

The uproar in the community led to months of meetings about the firings, at which Dr. Pavel was the most prominent speaker.  This was clearly a matter of public concern.

He spoke not in the context of his job as professor, but as a respected member of the Native American community.  Pavel Decl ¶ 30.

One such event Dr. Pavel recalls was with the Native Strategies Group, a collective of

students, staff, faculty, and administrators interested in Native American issues at the University of Oregon. Pavel Decl ¶ 31. The University also scheduled several listening sessions at the University, as well as a community meeting at the Lane Community College longhouse. In addition, James C. Bean, the Senior Vice President and provost, called a private meeting with Dr. Pavel, Dr. Klopotek, and another Native American faculty member from the library whose name he does not recall.

Dr. Pavel's purpose in speaking out was to support Dr. Ball, to oppose his termination and the lack of leadership undermining the efforts of Dr. Ball, versus politicization of the situation and usurpation of ground-level communication. Pavel Decl ¶ 32. There was a great variety of listeners (as evidenced by the local news coverage).

Defendants' assertion that Dr. Pavel's statements in support of Dr. Ball were all made two years before his termination is not accurate. The following evidence provides circumstantial evidence, both by way of timing, and animus, for a jury to infer that Dr. Pavel's opposition to Dr. Ball's firing was a motivating factor in his termination.

Jason Younker was hired as the University's Assistant Vice President and Advisor to the President on Sovereignty and Government to Government Relations in August 2014. Pavel Decl ¶ 33. This was a new position that in effect replaced Dr. Ball's position. As explained directly *infra*, Dr. Younker and Dr. Pavel spoke at that time about Dr. Pavel's strong feelings about Dr. Ball's firing. Only three months later Dr. Pavel was suspended without pay pending the investigation of the sexual harassment allegations.

When Dr. Pavel first met Dr. Younker, he told Dr. Younker (orally, in person) that he should have a meeting and ceremony to officially apologize to Dr. Ball for the way he was

treated. Pavel Decl ¶ 34. Dr. Younker responded that he understood Dr. Pavel might be uncomfortable because he had worked with Dr. Ball. He told Dr. Pavel he was having to put out fires caused by the firings, and he placed the blame with Yvette Alex-Assensoh. He appeared to want Dr. Pavel to affirm that Dr. Younker was fixing the problem, and to just move on and forget that the University had mistreated an elder. Dr. Younker appeared to be unhappy with Dr. Pavel for speaking out in support of Dr. Ball and not supporting Dr. Younker's approach, which did not include addressing the insult to Dr. Ball.

Dr. Younker was not cordial or collegial with Dr. Pavel as would be expected between academic colleagues who would be expected to work together. Pavel Decl ¶ 35. He did not come visit Dr. Pavel in his office as would be the normal approach. Dr. Pavel had to go seek him out when he needed his feedback. Dr. Pavel had a proposal he and a colleague were seeking support for and, after initially indicating support, Dr. Younker refused to sign on. At that time, which was during the investigation, Dr. Younker indicated to Dr. Pavel's colleague that the sexual harassment allegations were widely known. Id.; Exhibit Q. The complaint and investigation were supposed to be kept confidential, but Dr. Younker's statements and actions indicated that he did not do so. As he was the primary "government-to-government" liaison between the University and tribal entities, a jury would be entitled to believe that Dr. Younker's influence greatly affected the investigatory process and the decision to terminate Dr. Pavel.

Dr. Pavel was not invited to participate in the process for hiring the replacement for Dr. Tom Ball (the search committee chaired by Dr. Hubin), after speaking out about Ball's firing. He was the most outspoken professor regarding the firing of Dr. Ball. Pavel Decl ¶ 36.

Dr. Younker was one of the first people contacted during the Affirmative Action

investigation and he pushed for harsh treatment of Dr. Pavel. The family of the complaining student requested that Dr. Younker come to the initial interview with the University's Affirmative Action/Equal Opportunity office. Ex. A at 6. Dr. Younker expressed great animus towards Dr. Pavel in communications with the University's investigator regarding Dr. Pavel. For example, he conveyed to the investigator a completely false, spurious statement by Dr. Pavel's distant cousin that Dr. Pavel had assaulted someone. Exhibit R.

There is sufficient evidence for a jury to find that Dr. Younker was involved in retaliating against Dr. Pavel due at least in part to his statements in opposition to the firing of the person Younker replaced.

**IV. IF THE BURDEN SHIFTS BACK TO PLAINTIFF, HE HAS PRESENTED SUFFICIENT EVIDENCE FOR A JURY TO INFER THAT THE EMPLOYER'S REASONS FOR TERMINATING HIM WERE PRETEXTUAL**

In McDonnell Douglas, the Supreme Court explained that evidence of pretext can take many forms. 411 U.S. at 804-05, 93 S. Ct. 1817. For example, the manner in which the plaintiff was treated by his employer during his employment may be relevant to a showing of pretext. Id. Additionally, the fact that persons outside the plaintiff's protected class were treated better for offenses of comparable seriousness can also help demonstrate pretext. Id. at 805, 93 S. Ct. 1817.

The Ninth Circuit has also held that comparison with employees who are similarly situated is probative of the pretextual nature of the employer's actions. Gerdom v. Cont'l Airlines, Inc., 692 F.2d 602, 609 (9th Cir. 1982) (en banc); Piva v. Xerox Corp., 654 F.2d 591, 598 (9th Cir. 1981). In general, unequal treatment of a different class in the same employment context is significant evidence of pretext. B. Schlei & P. Grossman, Employment Discrimination Law 314 (Supp. 1979).

Deviation from prior policy is also probative of pretext. <u>Porter v. Calif. Dept of Corrections</u>, 419 F.3d 885 (9th Cir. 2005) (deviation, including coworker's suspicion of harassment before plaintiff even complained is evidence of pretext); <u>Giacoletto v. Amax Zinc Co.</u>, 954 F.2d 424, 427 (7th Cir. 1992) ("The jury could reasonably have concluded that because Amax neglected to follow [its] procedures for helping employees to overcome their deficiencies, the company had fired Giacoletto not because of his asserted deficiencies, but to retaliate [against him]"); <u>Garrett v. Hewlett-Packard Co.</u>, 305 F.3d 1210, 1220 (10th Cir. 2002) (holding that deviations from an employer's regular procedures established pretext); <u>see also</u> <u>Russell v. TG Mo. Corp.</u>, 340 F.3d 735, 746 (8th Cir. 2003) ("We agree . . . that an employer's deviation from its own policies can, in some instances, provide evidence of pretext"); <u>Bass v. Bd. of County Comm'rs</u>, 256 F.3d 1095, 1108 (11th Cir. 2001) ("An employer's violation of its own normal hiring procedure [was] evidence of pretext"); <u>Stern v. Trs. of Columbia Univ.</u>, 131 F.3d 305, 313 (2d Cir. 1997) (reiterating that an employer's departure from regular procedures can be indicative of pretext).

As explained *supra*, no other tenured professors with sexual harassment complaints against them were involuntarily terminated. This satisfies both of these showings probative of pretext – deviation from prior procedure, and treating people in the non-protected class (white males and the single female) better than Dr. Pavel. Dr. Pavel has presented sufficient evidence for a jury to find that he was the victim of either 1) racial discrimination; 2) gender discrimination; or 3) First Amendment retaliation.

## V.     AN AWARD OF FEES WOULD NOT BE APPROPRIATE

If the court does dismiss one or more claims, it is not appropriate to award attorney fees

to the defendants.

Prevailing defendants may be awarded attorney's fees pursuant to 42 U.S.C. 1988(b) only when the plaintiff's civil rights claim is "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so."  Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S. Ct. 694 (1978) (Title VII case).  See also Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173 (1980) (applying Christiansburg to 42 U.S.C. 1983 claim); Thomas v. City of Tacoma, 410 F.3d 644, 648 (9th Cir. 2005) (citing Christiansburg); Hudson v. Western Airlines, Inc., 851 F.2d 261, 267 (9th Cir. 1988) (citing Christiansburg); Maag v. Wessler, 993 F.2d 718, 721 (9th Cir. 1993) (citing both Hughes and Christiansburg and upholding denial of fees to defendants); Dooley v. Reiss, 736 F.2d 1392, 1396 (9th Cir. 1984), cert denied, 469 U.S. 1038 (1984) (citing Hughes); Mitchell v. Los Angeles Community College Dist., 861 F.2d 198, 202 (9th Cir. 1988) (citing Hughes and Dooley, and stating defendant fees awardable only in exceptional cases).

A prevailing defendant is entitled to attorned fees under 42 U.S.C. 1988 only when the plaintiff's claims are "groundless, without foundation, frivolous, or unreasonable."  Karam v. City of Burbank, 352 F.3d 1188, 1195-96 (9th Cir. 2003) (citing McCarthy v. Mayo, 827 F.2d 1310, 1318 (9th Cir. 1987)).  A case may be deemed frivolous only when the "result is obvious or the . . . arguments of error are wholly without merit."  Id. (citing McConnell v. Critchlow, 661 F.2d 116, 118 (9th Cir. 1981)).

In Karam, the Court in particular rejected the argument that the plaintiff's First Amendment retaliation claim was frivolous:

> Whether the rejection of Karam's First Amendment retaliation claims supports an award of attorney fees is a closer question.  In responding to the motion for summary

judgment, Karam failed to present evidence establishing a genuine issue of material fact on the causation element of her claims. However, her inability to defeat summary judgment does not mean that her claims were groundless at the outset. See Mitchell v. Office of Los Angeles County, 805 F.2d 844, 847 (1986) ("There is a significant difference between the bringing of cases with no foundation in law or facts at the outset and the failure to present evidence sufficient to justify relief at trial.").

Based upon the circumstances known to Karam at the time she filed her complaint, and preceding the summary judgment proceedings, her First Amendment retaliation claims were not frivolous, unreasonable or groundless within the meaning of 42 U.S.C. 1988. Karam frequently spoke at City Council meetings and had seen Officer Sindle on previous occasions. The day after the events giving rise to her prosecution, Karam attended a press conference during which she attempted to ask Mayor Murphy questions about the airport expansion. As Karam was asking the questions, the Mayor turned to talk to City Manager Bud Ovrom. Ron Vanderford, a private citizen who also attended the press conference, then observed a uniformed police officer rapidly approach Karam. Before the officer reached Karam, Ovrom said, "Just let her go. We'll get her later." Detective Miranda's report prepared thereafter contained the false statement that Karam admitted violating Officer Sindle's order.

These circumstances furnish some basis, albeit somewhat tenuous, for one to theorize that the Mayor and perhaps other city officials, tired of Karam speaking out against them, instigated the chain of events that led to her prosecution. During the summary judgment proceedings, however, evidence to support such a theory failed to materialize, and summary judgment was properly granted in favor of the defendants. But that did not render groundless, without foundation or frivolous, within the meaning of 42 U.S.C. 1988, the First Amendment claims Karam had asserted.

Similarly, the claims presented herein are not frivolous, and an award of fees to defendants would be inappropriate.

**CONCLUSION**

Based upon this brief and the evidence before the court, plaintiff respectfully requests that the court reject defendants' motion for summary judgment; and reject the defendants' request for an award of attorney fees.

Respectfully submitted August 27, 2017.


    /s/  Marianne Dugan   

Marianne Dugan, OSB # 932563
Attorney for Plaintiff
259 E. 5th Ave., Ste 200-D
Eugene, Oregon 97401
(541) 338-7072