**Amanda M. Walkup, OSB 934508**
awalkup@hershnerhunter.com
**Alexandra P. Hilsher, OSB 114218**
ahilsher@hershnerhunter.com
Hershner Hunter, LLP
180 East 11th Avenue
P.O. Box 1475
Eugene, OR 97440
Telephone: (541) 686-8511
Facsimile: (541) 344-2025

**Of Attorneys for Defendants**

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DISTRICT

| | |
|---|---|
| **CHIXAPKAID DONALD MICHAEL PAVEL**;<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>**UNIVERSITY OF OREGON; DOUG BLANDY; PENELOPE DAUGHERTY; ANNIE BENTZ; RANDY KAMPHAUS; JULIET A. BAXTER; JANNE UNDERRINER; JASON YOUNKER;** and **BRIAN KLOPOTEK**;<br><br>　　　　Defendants. | Case No. 6:16-CV-00819-AA<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR SECOND MOTION FOR SUMMARY JUDGMENT** |

I.  **Introduction.**

Plaintiff has failed to show that there are any genuine issues of material fact regarding his remaining claims. Therefore, the Defendants' motion for summary judgment should be granted.

II. **Plaintiff Has Failed To Introduce Any Evidence That Creates A Triable Issue Of Fact On His Race And Gender Discrimination Claims.**

To survive summary judgment on his Title VII and Section 1981 claims, Plaintiff must first make out a *prima facie* case, either by establishing the factors articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) or by producing other direct or circumstantial evidence sufficient to give rise to an inference of discrimination. *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690-91 (9th Cir. 2017).[1] If Plaintiff succeeds in establishing a *prima facie* case, the burden of production shifts to Defendant to produce a legitimate, nondiscriminatory reason for Plaintiff's termination. If Defendant does so, the burden then shifts back to Plaintiff to produce additional evidence showing that Defendants' stated nondiscriminatory reason is mere pretext. *Id.* at 691.

Here, Plaintiff cannot make out a *prima facie* case because he cannot point to any similarly situated comparators who were treated more favorably than he was and has not introduced any other evidence that would give rise to an inference of discrimination. Even if Plaintiff could establish a *prima facie* case, the University had a legitimate, nondiscriminatory reason for Plaintiff's termination, a formal sexual harassment complaint against Plaintiff that was found to be substantiated. Plaintiff cannot show that the University's legitimate, nondiscriminatory reason is mere pretext. Thus, Defendants are entitled to summary judgment.

A. **Plaintiff cannot establish a *prima facie* case.**

To establish a *prima facie* case, Plaintiff must either show that a similarly situated employee outside his protected class was treated more favorably or that other circumstances give rise to an inference of discrimination. Plaintiff can do neither.

1. **Plaintiff cannot point to any similarly situated comparators who were treated more favorably than Plaintiff.**

To be similarly situated under the *McDonnell Douglas* framework, the employees must be similar "in all material respects." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116 (9th Cir.

---

[1] The same legal analysis applies to Plaintiff's Title VII and Section 1981 claims. *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007).

2009). Here, Plaintiff has asserted that he was similarly situated to nineteen other tenured professors who were named in sexual harassment complaints. Plaintiff's Response to Defendants' Second Motion for Summary Judgment ("Plaintiff's Response"), p 6; Declaration of Marianne Dugan in Response to Second Motion for Summary Judgment ("Dugan Dec."), Exhibit H ("Exhibit H"). Plaintiff is using this comparison in an effort to establish that he was treated less favorably with regards to his discipline than the other University tenured professors who were the subject of a sexual harassment claim. Plaintiff's Response, pp 6-7. However, for the reasons stated below, there were no other tenured professors at the University who were similarly situated to Plaintiff and treated more favorably.

> a. **The majority of the complaints listed in Exhibit H were informal complaints; the complaint against Plaintiff was a formal complaint.**

At all material times, the University's policy allowed for students to file formal or informal complaints regarding sexual harassment by a faculty member. Deposition of Penelope Joan Daugherty ("Daugherty Depo."), pp 19-20.[2] If the complaint was an informal complaint, then there would be no investigation or disciplinary action. *Id.* Instead, an informal complaint "provide[d] notice of the concern, clarification about policy, with the intent that that would prevent a future recurrence." *Id.* at p 20. In other words, informal complaints were handled in a way that was more educational than disciplinary. The complaint filed against Plaintiff that is the subject of this litigation (the "Formal Complaint") was filed as a formal complaint. Declaration of Doug Blandy in Support of Defendants' Second Motion for Summary Judgment filed on July 7, 2017, Docket No. 81 ("Blandy Second Dec."), Exhibit 1, p 7. Looking at Exhibit H, there is a column that identifies which of the complaints listed were filed as formal or informal. Because formal and

---

[2] Excerpts of the depositions of Penelope Joan Daugherty and Doug Blandy are attached to the Declaration of Amanda M. Walkup filed in Support of Defendants' Reply in Support of their Second Motion for Summary Judgment ("Walkup Second Dec.").

informal complaints were handled in materially different ways by the University, and because informal complaints did not result in an investigation or disciplinary action, informal complaints are not comparable to formal complaints. Therefore, Plaintiff was not similarly situated with those professors who were subject to informal complaints.

### b. The University's disciplinary process changed in 2013.

Effective July 1, 2013, represented members of the University faculty, through the United Academics union, entered into a collective bargaining agreement ("Union Contract") with the University. Declaration of Doug Blandy in Support of Defendants' Reply in Support of Defendants' Second Motion for Summary Judgment ("Blandy Third Dec."), ¶ 3; Dugan Dec., Ex. B. This was the first union contract between the parties. Blandy Third Dec., ¶ 3. As a result of the Union Contract, the general University policy regarding discipline and termination no longer applied to the represented faculty. *Id*., ¶¶ 3-4. Instead, the represented faculty were subject to the discipline policy set forth in the Union Contract. Blandy Third Dec., Exhibit 2. This was a material change to how a represented faculty member could be disciplined. For example, if the University decided to impose a sanction more severe than an oral or written reprimand, the University's general disciplinary policy required the University President to issue formal charges and, upon the employee's request, conduct a formal hearing. Blandy Third Dec., ¶4. Under the Union Contract, the represented faculty member has the right to representation, to progressive discipline and has grievance rights, including binding arbitration. Blandy Third Dec., Exhibit 2. The formal complaint against Plaintiff was the first complaint filed at the University following the significant changes to the University's faculty disciplinary process. Blandy Second Dec., Exhibit 1, p 7, fn 2. Therefore, Plaintiff was not similarly situated with those professors whose complaints were filed prior to July 1, 2013.

       c.  **Plaintiff had a prior informal complaint alleging nearly identical misconduct.**

Prior to the Formal Complaint, there was an informal complaint made against Plaintiff by a different female student regarding nearly identical behavior. Blandy Second Dec., Exhibit 1, pp 7, 19. That first complaint was filed as an informal complaint. *Id.* As a result of the informal complaint, Plaintiff was counseled on two separate occasions by different University officials regarding the inappropriate conduct. Blandy Second Dec., Exhibit 1, pp 19-21. The fact that Plaintiff had received these two warnings <u>before</u> the conduct alleged in the Formal Complaint played a role in the University's decision to terminate Plaintiff. Blandy Depo., pp 28-29.

       d.  **There were no similarly situated University faculty members who were treated more favorably than Plaintiff.**

There were three other formal complaints of sexual harassment made against tenured faculty after July 1, 2013, all occurring after the formal complaint filed against Plaintiff. Exhibit H. The male faculty member listed in Exhibit H as having received a Letter of Reprimand following a formal complaint in 2016 was not similarly situated to Plaintiff because he was not found to have violated the University's sexual harassment policy. Dugan Dec., Ex. I, pp 42-46; 60-65. A second tenured male faculty member subject to a complaint after July 1, 2013 was found to have violated the University's sexual harassment policy and was notified that he was going to be terminated; he elected to resign in lieu of termination. Dugan Dec., Ex. I, pp 95- 97. Therefore, although he was similarly situated to Plaintiff, he was not treated more favorably.[3]

---

[3] Plaintiff seems to argue in Plaintiff's Response that, because this faculty member quit before being terminated, he was treated more favorably than Plaintiff. This argument is a red herring. It should be obvious that any faculty member, including Plaintiff, has the option to resign at any time prior to termination. Blandy Third Dec., ¶ 6. The relevant point with respect to this faculty member is not that he was "given the option to resign" (which all faculty members have at all times), but that the University had decided to terminate his employment after finding that he had violated the University's sexual harassment policy. Dugan Dec., Ex. I, pp 95- 97. That the employee quit does not change the fact that he otherwise would have been terminated.

Page 5 – DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SECOND SUMMARY JUDGMENT

{01487372.DOCX}

The third tenured faculty member subject to a formal complaint after July 1, 2013 was also not similarly situated to Plaintiff.[4] First, he had no prior disciplinary history nor had he received any prior warnings regarding inappropriate behavior. Blandy Third Dec., ¶ 7. Second, the formal complaint regarding this tenured faculty member was much different than what was alleged against Plaintiff. The faculty member had an ongoing faculty/student mentoring relationship with the student but had overstepped his bounds. *Id*. The faculty member and student both acknowledged having a friendship outside of the classroom. For example, between May and November 2015, they exchanged over 700 text messages, with approximately 400 of those messages initiated by the student. *Id*. The conversations included discussions of favorite music and alcoholic drinks, a story the student was writing, repartee with quotes from favorite movies, exchanging of puns, and other topics. They also exchanged poems. *Id*. The basis of the student's complaint was that, on several occasions, the faculty member overstepped his bounds and made her uncomfortable. For example, he was overly generous with the student and loaned her valuable electronic equipment like a camera and iPad. He visited her at her house and offered to pay for a trip overseas as a graduation gift. *Id*. Although there was an allegation of non-consensual contact, the alleged contact occurred after their friendship had developed. Because the faculty member was the student's professor of record during a portion of this timeframe, he had an obligation to recognize the power differential and to maintain professional boundaries. *Id*. As a result of the student's complaint, this faculty member was suspended without pay for one term. *Id.*

In contrast, the complaint against Plaintiff alleged that he secluded the female student at an off-campus event and then inappropriately touched her and asked harassing questions. Blandy Second Dec., Exhibit 1, pp 9-11. He kissed her hand, cheek and forehead in a non-platonic manner. The student reported feeling "trapped, confused and scared." *Id*. The student reported that, later

---

[4] As noted in Plaintiff's Response, this faculty member was Filipino. Plaintiff's Response, p 7.

that same evening, Plaintiff "touch[ed] her butt." *Id.* Notably, Plaintiff had been accused of nearly the same behavior with another female student several years earlier and, as indicated above, he had received counseling on two separate occasions about that inappropriate behavior. Because the issue here is whether Plaintiff's termination was less favorable than discipline given to other similarly-situated University faculty members, the underlying facts of each complaint are relevant. Also, because Plaintiff's history of prior warnings for similar behavior played a role in the University's decision to terminate Plaintiff, the other faculty member's lack of prior counseling about inappropriate conduct is a material difference. Because this other faculty member was not the same as Plaintiff in all material respects, including disciplinary history and the severity of the conduct alleged in the complaint against him, he was not similarly situated to Plaintiff.

Because there were no similarly situated faculty members at the University treated more favorably, Plaintiff is unable to prove an essential element of his *prima facie* case of discrimination.

### 2. **Plaintiff has not introduced sufficient evidence to give rise to an inference of discrimination.**

Plaintiff cites numerous Ninth Circuit cases for the proposition that "very little" evidence is required for plaintiff to survive summary judgment on his Title VII claims. But the cases cited involved much stronger evidence of discriminatory intent, usually in the form of overt statements. *See*, *e.g.*, *Reynaga*, 847 F.3d at 692 (coworker's racist statements coupled with employer's "failure to ever legitimately reprimand" coworker); *Metoyer*, 504 F.3d at 937 (supervisors told plaintiff "there are no people of color on senior staff and it's very unlikely that there will be" and said of African American employees "all of these people are lazy and malingerers"); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1109-11, 1123 (9th Cir. 2004) (employer's "permissive response" to coworkers' racist statements and racist graffiti plus total lack of evidence for "hiring freeze" proffered by employer as nondiscriminatory reason for failing to promote plaintiff); *Chuang v. UC*

Page 7 – DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SECOND SUMMARY JUDGMENT

{01487372.DOCX}

*Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (use of racial slur and other racist statements); *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (statements and meeting notes). Here, Plaintiff has not introduced any evidence sufficient to give rise to an inference of discrimination.

        a.    **The allegedly "hostile and pre-judged" AAEO investigation of Plaintiff is not evidence of discrimination per Plaintiff's own witness.**

Plaintiff argues that the allegedly "hostile and pre-judged" nature of the investigation is sufficient evidence to give rise to an inference of discrimination. But Plaintiff's own evidence shows that, even if the investigation was hostile or pre-judged, it did not differ in that regard from other investigations conducted by the University's Office of Affirmative Action and Equal Opportunity ("AAEO"). Specifically, the Declaration of Debra Merskin filed with Plaintiff's Reply states[5]:

> **As with other investigations I have observed,** the Affirmative Action/Equal Opportunity investigator only orally represents that 'it has been reported that' certain things occurred. Like any accused person, Dr. Pavel was visibly greatly stressed during the meeting, and **as with most of these AA/EO investigation meetings, the investigative process** lacks all sense of compassion but rather **presents a presumption of guilt with no meaningful opportunity to speak on one's behalf.**

Merskin Dec. ¶ 4 (emphasis added).

Ms. Merskin goes on to state:

> **The person accused is never given any documents,** is told they will hear some time in the future about this, **and is never given a meaningful opportunity to state his or her side.** In Dr. Pavel's meeting, **as in other meetings I have attended, AA/EO makes clear that the accused is presumed guilty from the outset** and is done for, now that Affirmative Action/Equal Opportunity has gotten involved.

*Id.* at ¶ 8 (emphasis added).

---

[5] Defendants do not agree that Ms. Merkin's characterizations are accurate.

Page 8 – DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SECOND SUMMARY JUDGMENT

Based on these statements from Plaintiff's own witness, there is no evidence from which a reasonable jury could find that the alleged hostile or pre-judged tone of the investigation was indicative of discrimination against Plaintiff. To the contrary, Plaintiff's own evidence indicates that any such treatment was the same as that received by other employees under investigation by the AAEO Office without regard to race or gender.

### b. Plaintiff's attempt to impute discriminatory animus to the decisionmaker fails.

Plaintiff also argues that the investigation was tainted by the racial animus of Plaintiff's colleague, Dr. Janne Underriner, and a University student, invoking a "cat's paw" theory. Plaintiff's Response, pp 13-17. His argument fails.

A subordinate employee's bias can be imputed to a decision maker only if the plaintiff "can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007); *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (employer can be liable where a supervisor performs an act motivated by discriminatory animus that is *intended* by the supervisor to cause an adverse action and that adverse action then occurs). Further, "to survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

Plaintiff has offered no evidence that the male student referenced in Plaintiff's Response (*see* Plaintiff's Response at p 14) was a University employee, so there is no legal support for Plaintiff's "cat's paw" theory with respect to that student. With respect to Dr. Underriner, to survive summary judgment, Plaintiff must submit evidence that Dr. Underriner: 1) had discriminatory animus towards Plaintiff; and 2) that her alleged interference in the University's investigation of the Formal Complaint was done with the intent to cause Plaintiff to be terminated.

*Poland*, 494 F.3d at 1182; *Staub,* 562 U.S. at 422.  Plaintiff has failed to produce any evidence that Dr. Underriner was biased against him because of his race or gender.  The only specific evidence from Plaintiff of any bias by Dr. Underriner is one stray comment that she allegedly made during a conversation about whether she was the appropriate director for the Northwest Indian Language Institute.  Declaration of Chixapkaid Donald Michael Pavel in Response to Second Motion for Summary Judgment ("Pavel Dec."), ¶ 26.[6]  That comment was not about Plaintiff, nor was it racially discriminatory.  Further, there is no evidence that Dr. Underriner was acting with the purpose of getting Plaintiff fired.  Any assertion to the contrary is mere speculation.

Defendant Blandy was the only person responsible for deciding to terminate Plaintiff's employment with the University.  Declaration of Doug Blandy in Support of Individual Defendants' Motion for Partial Summary Judgment filed on December 12, 2016, Docket No. 37 ("Blandy First Dec."), ¶ 4.  As he testified in his deposition, he based his decision on the investigatory report that had been drafted by the AAEO.  Blandy Second Dec., ¶ 6; Blandy Depo., p 28, 17-21.  He did not consult with Dr. Underriner at any time regarding Plaintiff, including regarding the Formal Complaint or whether to terminate Plaintiff's employment.  Blandy Third Dec., ¶ 8. Without any evidence showing that Dr. Underriner was biased against Plaintiff because of his race or that her involvement in the University's investigation was for the purpose of getting Plaintiff fired, Plaintiff's "cat's paw" theory fails.

> B. **Even if Plaintiff could establish a *prima facie* case, which he cannot, he has not put forth sufficient evidence of pretext to survive summary judgment.**

It is undisputed that Defendants have put forth a legitimate, nondiscriminatory reason for Plaintiff's termination, shifting the burden back to Plaintiff to show pretext.  "A plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for her prima facie case in order to rebut the defendant's showing." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217,

---

[6]  Defendants do not concede that Dr. Underriner made the alleged statement.

1220 (9th Cir. 1998). Where a plaintiff relies on circumstantial evidence to show pretext, it "must be specific and substantial." *Id.* at 1222 (circumstantial evidence of pretext was substantial where "all of the evidence supporting the employer's proffered reasons came from statements, depositions, and declarations prepared after the employment decision was made and while this litigation was in progress" and contemporaneous evidence contradicted these statements); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).

Here, Plaintiff's argument that Defendants' stated reason for termination is pretextual relies on the same evidence from which Plaintiff attempts to establish his *prima facie* case, which is that "no other tenured professors with sexual harassment complaints against them were involuntarily terminated." Plaintiff's Response at p 22.[7] As discussed in detail above, Plaintiff cannot point to a single similarly situated employee who was treated more favorably. Given that Plaintiff cannot even establish a *prima facie* case with this evidence, it is certainly insufficient to rebut Defendants' nondiscriminatory reason for terminating Plaintiff's employment. Plaintiff's circumstantial evidence claimed to show pretext is neither specific nor substantial.

Moreover, Plaintiff has produced no evidence of pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang*, 115 F.3d at 1123. Plaintiff has repeatedly testified that he has no evidence that the University's investigation or decision to terminate him was based on his race or gender. Declaration of Amanda M. Walkup in

---

[7] Plaintiff argues that this evidence also shows pretext because it constitutes a "deviation from prior procedure." This argument fails for two reasons. First, to the extent Plaintiff's "deviation from procedure" argument is simply a restatement of Plaintiff's claim that similarly situated individuals outside Plaintiff's protected class were treated more favorably, as explained above, Plaintiff has not identified a single similarly situated comparator treated more favorably. *See* Part I.1.a, *supra*. Second, as Plaintiff concedes, the union contract applicable to Plaintiff's employment "does state that some behavior is severe enough to warrant immediate termination." (Response at p 11.) Because Plaintiff's termination was consistent with the union contract, there was no "deviation from policy."

Support of Defendants' Second Motion for Summary Judgment filed July 7, 2017, Docket No. 80 ("Walkup First Dec."), Exhibit 2, p 5, ln 10-13; p 15, ln 1-10.

For all the foregoing reasons, Defendants are entitled to summary judgment on Plaintiff's race and gender discrimination claims.

### III. Plaintiff Has Failed To Introduce Any Evidence That Creates A Triable Issue Of Fact On His First Amendment Retaliation Claim.

Plaintiff has correctly stated the five-step analysis the Ninth Circuit applies to First Amendment retaliation claims: the plaintiff must first establish that (1) he spoke on a matter of public concern, (2) he spoke as a private citizen and not as a public employee, and (3) his protected speech was a substantial or motivating factor in an adverse employment action. The burden then shifts to the defendant, which can avoid liability by showing *either* that (4) a legitimate administrative interest outweighed the employee's right to free speech or (5) the defendant would have taken the adverse employment action even absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

As an initial matter, Plaintiff has not even attempted to refute Defendants' showing that Defendants would have terminated Plaintiff's employment regardless of his allegedly protected speech. (Response at pp 17-21.) For this reason alone, Defendants are entitled to summary judgment on this claim.

Instead, Plaintiff's Response focuses entirely on the first three steps of the five-step analysis described above. Plaintiff makes much of the fact that he spoke to Jason Younker, Ph.D. regarding his opposition to the firing of Thomas Ball, Ph.D. in August 2014, three months prior to the commencement of the investigation that led to his termination. But three months is too long a gap between protected speech and adverse action to create a triable issue regarding Defendant's motivation for terminating Plaintiff. *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 744 (9th Cir. 2001) (citing *Erickson v. Pierce County*, 960 F.2d 801, 803 (9th Cir. 1992) for the

proposition that three months is too long to demonstrate proximity in time).[8]

Moreover, Plaintiff's argument that the timing and Dr. Younker's alleged hostility toward him are enough to show that his speech was a motivating factor in his termination simply does not make sense in the context of the timeline as a whole. According to Plaintiff's declaration, Plaintiff's allegedly protected speech began around the time of Dr. Ball's firing in December 2012 and instances of allegedly protected speech occurred as late as August 2014. Pavel Dec., ¶¶ 30-34. But Plaintiff complains of no adverse employment actions during that time. Only after an undergraduate student complained that Plaintiff had touched her inappropriately, and that complaint was found to be substantiated, was Plaintiff's employment terminated. The only logical interpretation of this series of events is that the University's actual reason for terminating Plaintiff was the outcome of the sexual harassment investigation, and that Plaintiff's statements were not a motivating factor in his termination, let alone a substantial one.

Plaintiff's thin evidence of Dr. Younker's alleged hostility is of little importance because it is undisputed that Dr. Younker did not conduct the sexual harassment investigation or make the decision to terminate Plaintiff's employment. Blandy Second Dec., Exhibit 1; Blandy Third Dec., ¶ 8. Dr. Younker was not interviewed as part of the University's investigation of the Formal Complaint. Blandy Second Dec., Exhibit 1. Defendant Blandy denies having had any contact with Dr. Younker regarding Plaintiff between the time Defendant Blandy learned of the Formal

---

[8] Plaintiff has cited mostly Title VII retaliation cases as support for his argument on his First Amendment retaliation claim. *See*, *e.g.*, *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885 (9th Cir. 2004); *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2003); *Bell v. Clackamas County*, 341 F.3d 858 (9th Cir. 2003). Though the concept of retaliation is similar in both contexts, Title VII retaliation cases employ a different analytical framework than that applicable to First Amendment retaliation cases. In a Title VII retaliation case, the plaintiff must first establish a *prima facie* case by showing "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between" the two. *Stegall*, 350 F.3d at 1065-66. If the plaintiff makes out a *prima facie* case, the *McDonnell Douglas* burden shifting framework then applies. *Id.* at 1066. In contrast, in First Amendment retaliation claims, the Ninth Circuit applies the five-step analysis described at the beginning of this section, *supra* and in *Eng*, 552 F.3d at 1070. Plaintiff's reliance on Title VII retaliation cases is misplaced as Plaintiff has not asserted any Title VII retaliation claims.

Complaint and when Plaintiff was terminated. Blandy Third Dec., ¶ 8. There is simply no evidence to support Plaintiff's argument that Dr. Younker exerted such influence over the investigation or Defendant Blandy's decision to terminate Plaintiff.

Finally, Defendant has introduced sufficient evidence to show that it would have terminated Plaintiff regardless of his speech (Blandy First Dec. at ¶ 4; Blandy Second Dec., Exhibit 1), and Plaintiff has done nothing to rebut that evidence. There is no genuine issue of material fact on this point. Defendants' Motion should be granted as to Plaintiff's First Amendment retaliation claim for the foregoing reasons and for all the reasons stated in Defendants' Motion.

IV. **Conclusion**

For all the foregoing reasons, Defendants' Second Motion for Summary Judgment should be granted in full and this Court should enter judgment in favor of Defendants on each of Plaintiff's remaining claims.

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word-count limit under LR 7-2(b) because it contains 4,367 words, including headings, footnotes and quotations, but excluding the caption, signature block, exhibits, and any certificates of counsel.

DATED: September 19, 2017.

HERSHNER HUNTER, LLP

By   */s/ Amanda M. Walkup*
**Amanda M. Walkup, OSB 934508**
awalkup@hershnerhunter.com
**Alexandra P. Hilsher, OSB 114218**
ahilsher@hershnerhunter.com
Telephone: (541) 686-8511
Facsimile: (541) 344-2025
**Of Attorneys for Defendants**

Page 14 – DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SECOND SUMMARY JUDGMENT

{01487372.DOCX}