IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CHIXAPKAID DONALD MICHAEL
PAVEL,

      Plaintiff,

vs.

UNIVERSITY OF OREGON; DOUG
BLANDY; PENELOPE DAUGHERTY;
and RANDY KAMPHAUS,

      Defendants.

Case No. 6:16-cv-00819-AA
**OPINION AND ORDER**

---

AIKEN, Judge:

Plaintiff CHIXapkaid Pavel asserts various claims related to the termination of his employment against defendants University of Oregon, Doug Blandy (the University's Senior Vice Provost for Academic Affairs), Penelope Daugherty (the University's Director of Affirmative Action & Equal Opportunity), and Randy Kamphaus (the University's Dean of the

College of Education).[1] Plaintiff alleges defendants violated his rights under federal discrimination statutes, the Due Process Clause, and the First Amendment. I previously entered summary judgment in defendants' favor on plaintiff's Due Process Clause claims, and defendants now move for summary judgment on plaintiff's remaining claims.

Oral argument on this motion was held on November 29, 2017, at 10:00 a.m. For the reasons set forth below, I GRANT defendants' second motion for summary judgment (doc. 79).

## BACKGROUND

Plaintiff was a tenured professor at the University of Oregon's College of Education from September 16, 2010, until the University of Oregon ("the University") terminated his employment contract on January 21, 2015, in response to a student's sexual harassment complaint. At all relevant times, plaintiff was a member of the United Academics of the University of Oregon, American Association of University Professors – American Federation of Teachers, AFL-CIO, ("the Union") and the terms of his employment were governed by the collective bargaining agreement ("the CBA") between the University and the Union. At the time of his termination, plaintiff was the senior Native American faculty member and the only Native American full professor at the University. He was also the first tenured professor at the University to be fired for sexual harassment.

On November 15, 2014, Janne Underriner, the University's Director of the Northwest Indian Language Institute, received a complaint about plaintiff's conduct at a University event the previous night. The initial complaint came via a phone call from the father of a first-semester freshman student. Two days later, in a private interview with the University of Oregon's Office of Affirmative Action and Equal Opportunity ("OAAEO"), the student explained that she knew

---

[1] Plaintiff initially named several additional University employees as defendants, but he stipulated to their dismissal in June 2017.

plaintiff because he was a close family friend involved in her tribal community. She had been in touch with him several times before she began courses at the University. At the November 14 event, the student approached plaintiff to say hello and took a photo with him. She alleged that plaintiff asked her to go into the hallway and talk, because he found it difficult to hear in the crowded main event space. The hallway was lined with mirrors. The student stated that plaintiff, who seemed to be intoxicated, got close to her face and told her to turn and look at herself in one of the mirrors. The student alleged that plaintiff put his right arm around her and turned to her face the mirror; while they looked in the mirror together, he told her she was "beautiful" and that all the boys were "drooling" over her. Dugan Decl. Ex. A at 9. The student reported that plaintiff then kissed one of her hands, pulled her close to him, kissed her cheek and forehead in a non-platonic manner, rubbed her back, and moved his hand down past her waist to rest on her butt. When she attempted to leave the interaction, plaintiff allegedly followed her into an elevator, stood behind her, and touched her dress and underwear when the other elevator passengers were facing the exit doors and could not see what he was doing. The student did not want plaintiff to touch her in the way that he did and felt extremely uncomfortable throughout the interaction.

The University placed plaintiff on administrative leave while it investigated the student's claim. The formal investigation launched on November 20, 2014. On November 21, 2014, plaintiff learned the university had placed him on leave.

In an interview with OAAEO, plaintiff denied the substance of the student's allegations and reported that he was "surprised, shocked and discouraged" by the allegations. *Id.* at 17. The were no eyewitnesses to most of the interaction, but OAEEO interviewed another student who corroborated some parts of the complainant's story. OAEEO also interviewed faculty, including Underriner, who reported that the interaction negatively affected the student academically,

including by causing her to change her area of study so she would not have to take classes taught by plaintiff.

OAEEO's investigatory file also documents a complaint, filed three years earlier by a Ph.D. student, that plaintiff had subjected that student to "inappropriate and unwelcome sexual attention." *Id.* at 18. This included inappropriate touching, including "tight hugs," touching the student's knee repeatedly during conversation, and even poking her in the belly button "as a joke." *Id.* at 53. The student reported that, on a work-related trip, the situation escalated when plaintiff stopped in front of a display window and turned the student toward the window. After telling the student to close her eyes, plaintiff allegedly put his hand on his shoulder and then moved it along her arm to her waist. He then turned the student toward him, making her think he was about to kiss her. The student expressly told plaintiff that she was interested only in a professional relationship; he responded by telling her that many students tell him they want to work as part of his research team when, in fact, those students are simply attempting to get close to him because they are sexually attracted to him. After that conversation, plaintiff told the student he no longer knew how to act around her, suggested they might have to correspond only electronically, and once again touched the student's knee during a conversation, at which point the student told plaintiff she no longer wished to work with him. That earlier complaint resulted in counseling but not in any sort of formal discipline.

On December 18, 2014, Anne Bonner and defendant Penny Daugherty from OAAEO sat down with plaintiff and union representative Debra Merskin to discuss the investigation. At the meeting, Daugherty and Bonner relayed their suspicion that plaintiff had engaged in a pattern of sexual harassment, and interviewed him to collect additional information regarding the accusations. Merskin characterized the tone of the meeting as passive-aggressive, disrespectful,

hostile, and accusatory. She further stated that, in her experience, OAAEO always approaches investigations in that aggressive manner—as though the investigated faculty member's guilt were a foregone conclusion. After the meeting, Daugherty told plaintiff that he was free to provide any additional evidence or documentation by January 6, 2015. Plaintiff believed he did not have time to adequately respond, so he never submitted any additional evidence.

At the conclusion of the University's investigation, plaintiff and Merskin met with various staff members on January 16, 2015, to discuss the University's findings. Participating staff members included defendants Doug Blandy and Randy Kamphaus. The University found by a preponderance of the evidence that plaintiff violated its sexual harassment policy and interfered with students' rights to equal access to education. Specifically, the University found that the plaintiff "engaged in unwelcome verbal and physical conduct of a sexual nature" that included touching a student's back, buttocks, and underwear. Blandy Decl. Ex. 3 at 1. The University also found that plaintiff made "[i]nappropriate comments of a sexual nature" and remarked "on the student's appearance after having her stand in front of a mirror." *Id*. These findings were presented to plaintiff in writing. Plaintiff had the opportunity to respond but made no comments during the meeting.

At the January 16 meeting, the University also notified plaintiff it intended to terminate their employment relationship on January 21, 2015. The University gave plaintiff until January 20, 2015, to submit any written response or relevant evidence to change the termination decision. Plaintiff never replied with any additional testimony or evidence. Instead, plaintiff responded with a request for more information. The University did not comply with plaintiff's request.

January 16 meeting was the first time plaintiff learned that the university contemplated terminating him.[2]

On May 5, 2015, plaintiff grieved his termination under the CBA. On February 22, 2016, the University offered plaintiff the opportunity to engage in arbitration under the CBA. Had the arbitration proceeded, plaintiff would have been able to "call witnesses, offer exhibits, and make arguments" that the University did not fire him for just cause. Brady Decl. ¶ 4 (doc. 39). Plaintiff's union withdrew from the arbitration and as such, plaintiff never received a post-termination hearing.[3]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine

---

[2] Defendants challenge this assertion on the basis that plaintiff does not support the statement in his declaration with personal knowledge, rendering his lay witness testimony inadmissible under Federal Rules of Evidence 602 and 701. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). Similarly, Federal Rule of Civil Procedure 56(c)(4) requires that affidavits be based on personal knowledge to carry weight on a motion for summary judgment. The testimony at issue speaks directly to plaintiff's awareness of the University's intent to fire him. *See* Fed. R. Evid. 701 (permitting lay witnesses to testify if the testimony is "rationally based on the witness's perception"). His statement therefore may be considered as part of the summary judgment record.

[3] The Union's decision not to proceed to arbitration was a critical consideration to my decision to grant the University summary judgment on plaintiff's due process claims. Although I found that Merskin's declaration raised a triable issue of fact as to actual bias in the pre-termination decisionmaking process, I concluded that the individual defendants were entitled to qualified immunity because "case law does not clearly establish that a pre-termination process requires unbiased arbiters when plaintiff has access to a robust pre-termination arbitration under his collective bargaining agreement." *Pavel v. Univ. of Or.*, 2017 WL 1827706, *11 (D. Or. May 3, 2017).

issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Celotex*, 477 U.S. at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

This case comes at a unique moment. For years, allegations of sexual assault and harassment have been swept under the rug when they instead should have been taken seriously, investigated, and decisively acted upon. As a glance at any news source shows, that is changing. The current national discussion revolves daily around allegations of sexual assault and harassment, and what institutions, communities, and governments should do, or should have done, to respond and protect the vulnerable.

At the same time, issues of race are coming to the fore in a similar long-overdue manner. The impacts of our shameful racial history, pervasive implicit bias, and institutionalized racism are now part of any meaningful discussion on social or institutional responsibility in America today. Norms on both fronts are in flux in dramatic ways, not just within progressive segments of society, but across the nation as whole.

The pressure facing institutions, particularly universities, to deal swiftly, seriously, and correctly with allegations of sexual assault is rightfully high, because the stakes for both victim and accused are also incredibly high. In such an environment, as the pendulum swings away from a position it has occupied for so long, shifting presumptions and burdens of proof, it is liable to take out many in its path. It is of no small concern that those most likely to experience

the detrimental impacts from any unfair application of these new priorities will be people of color.

Historically and currently, people of color shoulder disproportionate shares of punishment. *See, e.g.*, Demographic Differences in Sentencing: An Update to the 2012 *Booker* Report (U.S. Sentencing Commission Nov. 2017) (reporting that, in the federal system, black male offenders receive sentences on average 19.1 percent longer than similarly situated white male offenders). People of color are also disproportionately the victims of sexual harassment. *See, e.g.*, Tanya Katerí Hernández, *Sexual Harassment and Racial Disparity: The Mutual Construction of Gender and Race*, 4 Gender Race & Just. 183, 184–85 (2001) (surveying EEOC sexual harassment complaint data). A debate rages over whether the shifts in how we deal with campus sexual assault and harassment will disproportionately harm men of color. *Compare, e.g.,* Antuan M. Johnson, *Title IX Narratives, Intersectionality, and Male-Based Conceptions of Racism*, 9 Geo. J. Law & Mod. Crit. Race Persp. 57, 59 (2017) ("There is a history of race being used as a political tool to shut down conversations about sexual assault, even when it directly affects black women.") *with, e.g.*, Janet Halley, *Trading the Megaphone for the Gavel in Title IX Enforcement*, 128 Harv. L. Rev. F. 103, 109 (2015) ("To the extent that the campus-sexual-assault movement expresses the priorities and visions of white middle-class women, it may not be providing us with everything we need to know to make fair decisions in cases involving class, race, and other key differences.")

It is well established that implicit bias affects almost every decision that people make. *See, e.g.*, Justin D. Levinson et al., *Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev. 63, 79–82 (Jan. 2017). I would be remiss if I failed to acknowledge that such bias has wide-ranging impacts on institutional processes as a whole. As important

decisions are made, both on the grand scale and within the microcosm of individual situations, we must be mindful of the ever-present risk of perpetuating longstanding racial injustice. It is critical to change the way we respond to sexual harassment and assault, but members of minority communities must not be sacrificed as part of a knee-jerk reaction to political pressure to deal harshly with allegations of a sexual nature.

Here, I am presented with an individual case in which a Native American professor was fired after a student accused him of sexual harassment. I cannot adjudicate plaintiff's claims as a way of advancing my own views of how best to resolve the broad policy concerns outlined above; I am constrained to make a ruling based on the evidence presented in this case. Here, the evidence falls short of the necessary threshold to proceed to trial.

I. *Employment Discrimination Claims: Race Discrimination*

Plaintiff alleges that defendants fired him at least in part because he is Native American. He uses two vehicles to assert his race discrimination claims: (1) a claim, asserted via 42 U.S.C. § 1983, that individual defendants violated 42 U.S.C. § 1981, which prohibits racial discrimination in the formulation (or termination) of contracts, and (2) a claim that the University violated Title VII of the Civil Rights Act, which prohibits racial discrimination in making employment decisions. Here, those two claims can be analyzed together. To establish race discrimination under Title VII, a plaintiff must offer evidence that gives rise to "an inference of discrimination in whatever manner is appropriate in the particular circumstances." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). The legal principles that guide "a court in a Title VII dispute apply with equal force in a § 1981 action." *Reynaga v. Roseberg Forest Prod.*, 847 F.3d 678, 696 (9th Cir. 2017).

Plaintiff asserts that the hostile treatment that he received from the University, and the University's more favorable treatment of other similarly situated professors, is evidence of discriminatory motive behind his firing. Defendants move for summary judgment on these claims, arguing that plaintiff cannot establish a prima facie case of race discrimination, and even if he could, he does not rebut the University's legitimate, non-discriminatory reason for terminating his employment.

"To show a prima facie case of disparate treatment, a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful discrimination.'" *Reynaga*, 847 F.3d at 690 (quoting *Sischo–Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1110 (9th Cir. 1991)).

> One way to establish an inference of discrimination is by satisfying the prima facie elements from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 . . . (1973): (1) the plaintiff belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

*Id.* at 690–91 (citing *Hawn*, 615 F.3d at 1156 and *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)). At the summary judgment stage, the nonmoving party's burden is very low; a plaintiff may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason 'more likely than not motivated' the employer." *Id.* at 691.

The parties do not dispute that plaintiff belongs to a protected class as a racial minority, that he was performing according to his employer's legitimate expectations prior to the events that precipitated this action, and that plaintiff suffered an adverse employment action when he was terminated from his job at the University. Plaintiff's primary argument is that similarly situated white employees were treated more favorably than he was. To that end, plaintiff has presented evidence about other tenured professors who have had formal and informal sexual

harassment complaints filed against them. The evidence presented shows that such complaints were filed against nineteen professors, plus plaintiff. All but one of the complaints were filed against men.[4] Four cases were closed as unfounded. Ten of the professors do not meet the "similarly situated" test because the complained-of conduct was substantially less serious than the conduct at issue in plaintiff's case: those professors each received only one complaint, which included no allegations of physical contact. The five remaining professors are a closer match for plaintiff's situation because they, like plaintiff, (1) had multiple complaints in their files, (2) were accused of inappropriate physical contact, or (3) both. Of these five professors, three were nonwhite (Black, Asian, and South-East Asian/Pacific Islander), and two were white.[5]

Before proceeding to discuss the specific circumstances of the complaints against the five most similarly situated professors, I address two of defendants' arguments about comparator evidence. First, defendants make much of the difference between formal and informal complaints. A formal complaint triggers a formal investigation and can result in formal discipline, whereas an informal complaint is resolved using "an informal process [that] would

---

[4] Defendants also move for summary judgment on plaintiff's gender discrimination claim, which he asserts again the University under Title VII of the Civil Rights Act. There is no evidence in the record of any similarly situated woman being treated more favorably than plaintiff, nor is there evidence that any decisionmaker took gender into account when considering whether to terminate plaintiff. Plaintiff also submits no argument on this point. Plaintiff's gender discrimination claim fails because there is no evidence, circumstantial or otherwise, to give rise to an inference of gender discrimination.

[5] When plaintiff is included in the group, four of the six arguably similarly situated professors were nonwhite. The fact that two thirds of a certain type of complaint are filed against professors who are racial minorities could be evidence that students and co-workers report sexual harassment by nonwhite professors at rates disproportionate to their representation in the faculty—which could, in turn, affect how a governmental actor should respond to such complaints. However, a sample size of six is simply too small to support any conclusions about complaint trends. I must instead look at the circumstances of each complaint filed in order to determine whether any similarly situated professor was treated more favorably than plaintiff.

not result in a finding" of misconduct and thus cannot end in termination. Walkup Decl. Ex. 1 at 5–6, Sept. 19, 2017. Classification of the complaint as formal or informal rests with the complainant and is unrelated to the severity of the alleged conduct. As a result, I do not find the distinction between formal and informal complaints to carry much evidentiary weight, if any. It is the *content* of the complaint that matters most. A professor informally accused of inappropriately touching a student, for example, would be more similarly situated to plaintiff than a professor formally accused of yelling at a student in class.

Second, the University notes that plaintiff was the first professor against whom a formal complaint was lodged following the renegotiation of the faculty's union contract in 2013. They assert that due to those changes, I should not consider evidence involving any complaint filed against a tenured faculty member before 2013. I agree that changes to disciplinary procedures under the contract might be relevant to assessing evidence of discriminatory intent. But I reject defendants' attempts to draw a line in the sand, cutting off any pre-2013 comparator evidence.

I now proceed to address the particular circumstances of each of the five possible comparator professors. One nonwhite professor ("Professor #1")[6] was accused in an informal and a formal complaint of making inappropriate sexual comments in class, and after an investigation found those accusations were true, he was given an official letter of reprimand. Another nonwhite professor ("Professor #2") was also accused in an informal and a formal complaint of inappropriate behavior such as comments of a sexual nature, discriminating against women in his workplace and classroom, and asking a former graduate student what she would say if he expressed romantic interest in her. When the former student rebuffed Professor #2, he made no further advances. Nonetheless, Professor #2 was given an official letter of reprimand,

---

[6] I have assigned the professors pseudonymous numbers.

suspended without pay for one semester, ordered to do additional training, and warned that he could be terminated upon the next occurrence. An anonymous report also alleged a possible physical relationship between Professor #2 and a married graduate student, however this report was neither corroborated by the student in question nor substantiated by other evidence.

The third nonwhite professor ("Professor #3") was accused once in a formal complaint of making unwanted verbal and physical advances towards a student. The unwanted physical contact consisted of kissing the student on the neck and touching her arms. According to documents in the summary judgment record, because this was the first time this professor had been accused of sexual harassment and because there were unique circumstances, including a possible prior relationship with the complainant, Professor #3 was given a letter of reprimand, suspended without pay for a semester, ordered to do additional training, and warned that he could be terminated upon the next occurrence.

A fourth professor ("Professor #4"), a white man, was accused in an informal complaint of touching a student's hands, telling her she was beautiful, putting his hands on her hips, and asking to see her again. The student told him she was not interested in anything more than a student-teacher relationship, and he apologized for his advances and did nothing further. His discipline involved an informal resolution with the student in question and a warning. Three years later, there was a different anonymous informal report of unknown content that also resulted in an informal resolution.

The most analogous situation involves the fifth professor ("Professor #5"), a white man. Professor #5 was accused in a formal complaint (which actually consisted of several complaints in one) of verbally sexually harassing several students, retaliating against students for rejecting his advances, and making unwanted contact of a sexual nature with a student when he picked up

an item out of her lap and brushed his hand past her breast. After an investigation, he was notified that he would be terminated, but before his termination date, he resigned to avoid being fired. The University accepted his resignation on the condition that he abide by the University's non-retaliation policy, never serve in any capacity at any future campus functions, projects, or events, and never attend certain non-public events at the University. The University's communications with Professor #5 made it clear that if he had not resigned, he would have been terminated, and despite his voluntary spontaneous retirement, he was severely restricted from participation in the University in the future. He did not simply retire in good standing, but had ongoing restrictions applied to him.

Plaintiff was accused of sexual harassment in two informal complaints, the most recent one initiated by a mandatory reporter upon receiving notice of the incident at issue. The student involved in the incident that was the subject of the second informal complaint then decided to file a formal complaint. The student was a first-semester freshman who accused plaintiff of touching her, including on her buttocks and underwear; kissing her on her hand, cheek, and forehead; and making inappropriate comments of a sexual nature, according to OAAEO investigatory records and a police report that she filed to that effect. After an investigation, the University concluded the student's allegations were true.

The level of physical touching founded against plaintiff after an investigation makes this incident with plaintiff objectively different from the verbal misconduct founded against Professors #1 and #2. The complaints against Professors #3 and #4 were first-time complaints, unlike the instant complaint against plaintiff.

The University's treatment of Professor #5 was substantially similar to its treatment of plaintiff despite the fact that the accusations against the Professor #5, the white man who

resigned, were as severe as (or perhaps even more severe than) those against plaintiff. Professor #5 was told that he was going to be terminated, just as plaintiff was. Plaintiff had four days, including weekends, in which to decide what to do between the time he was notified of his impending termination and when the termination actually occurred. Similarly, Professor #5 had somewhere between one and thirteen days, including weekends, between when he was notified that he would be terminated and when he submitted his resignation. When the University accepted Professor #5's resignation, they did so only on the condition that he refrain from participating in future University functions, not serve as a teacher or mentor to University students, and abide by a number of other rules and restrictions. There is no indication that the University expressly offered retirement to Professor #5 to help him avoid discipline. Indeed, plaintiff also received forewarning of his impending termination, and could have resigned during that time had he chosen to do so.

Critically, unlike Professor #5, plaintiff had already been counseled in the past for substantially similar alleged acts. The circumstances of the report that precipitated plaintiff's termination were analogous to those of the 2011 complaint filed against plaintiff by a different female student. The investigation of the instant case took into consideration the fact that plaintiff's previous discipline had included extensive counseling, warnings, and education about appropriate professor-student relationships, boundaries, and physical contact. The investigation report indicated that informal methods of counseling and disciplining plaintiff had already been tried and had been unsuccessful at preventing this new incident.

In sum, the evidence shows that plaintiff was similarly situated to only one of the other professors, Professor #5, and that both plaintiff and Professor #5 were subjected to similar discipline despite their different races. Therefore, evidence does not exist in the record from

which a reasonable jury could conclude that other similarly situated tenured professors in an unprotected class were treated more favorably by the University than was plaintiff.

Additionally, there is no evidence, circumstantial or otherwise, in the record that any of those involved with the decision to terminate plaintiff's employment were influenced by racial bias. While plaintiff presents significant evidence that he was not well-liked by some faculty, including defendant Doug Blandy who was responsible for deciding whether to terminate plaintiff's employment, none of that evidence supports an inference of racial discrimination.[7] Similarly, although there is evidence OAAOE was aggressive and disrespectful during the meetings with plaintiff, there is no indication that aggression was a response to plaintiff's race; indeed, Merskin stated that OAAOE treats *all* accused faculty members in the same fashion. In fact, plaintiff's case for racial discrimination appears to arise almost entirely from the premise that because plaintiff is an openly American Indian male, the decision to terminate him was necessarily made in part for that reason, and that the circumstance of his being an openly American Indian male who was not well-liked by some colleagues is sufficient evidence thereof.

"[V]ery little evidence" is required to survive a motion for summary judgment on a race discrimination claim. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). However, very little evidence is still some evidence. Here, there is simply no evidence in the record from which a reasonable jury could infer race discrimination.

II.    *First Amendment Retaliation Claim*

Plaintiff next contends that he was terminated in retaliation for speaking out against the firing of Dr. Ball, a fellow Native American professor at the University, in violation of plaintiff's

---

[7] Plaintiff concedes that he has "no information or evidence showing that Dr. Blandy's decision to terminate [him] was driven by [his] race" or gender. Pavel Dep. Vol. 3, 72:1-10. (doc. 80 at 25).

First Amendment right to engage in free speech. Specifically, plaintiff alleges that Jason Younker, the University's Assistant Vice President and Advisor to the President, was hostile towards plaintiff because of plaintiff's speech, and that Younker was later interviewed as part of the University's investigation of the allegations against plaintiff, thereby participating in a retaliatory action against plaintiff. Defendants move for summary judgment on the basis that plaintiff has not put forth any evidence that his statements were a substantial or motivating factor in his firing, contending that the evidence shows the University fired plaintiff for violating its sexual harassment policy.

The Ninth Circuit has established a five-step test for First Amendment employment retaliation claims. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Courts analyzing such claims must ask:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* Here, there are two groups of potentially protected speech at issue: statements plaintiff made in 2012 and statements plaintiff made in 2014.

    i.    *2012 Statements*

In 2012, plaintiff spoke out against the firing of Dr. Ball, a Native American professor at the University. According to plaintiff, he spoke on this issue of public concern as a member of the community rather than in his capacity as a state employee. It is not necessary to decide whether plaintiff's statements met the public concern and private citizen tests, because there is insufficient evidence of causation. After plaintiff spoke out in meetings and other venues for

several months, two years went by until the events that precipitated this case, during which time plaintiff does not claim adverse employment actions were taken against him. I recognize that, as a practical matter, institutional memory can be long, and individuals may not forget exercises of free speech rights that they disagreed with, going back two, four, or ten years. However, as a matter of law, a temporal proximity of two years between the protected activity and the adverse employment action, by itself, is not enough to demonstrate a discriminatory purpose. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001); *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 752 (9th Cir. 2001). Here, other evidence indicating a causal link between the 2012 speech and the 2015 firing is not present in the record.

      ii.    *2014 Statements*

Younker was hired in 2014. At that time, plaintiff again expressed his belief that Dr. Ball should not have been fired and that his firing should now be handled in a particular way by the University, including with an apology and a ceremony. Younker did not follow plaintiff's recommendation, but explained that he was handling the situation in a different manner and, according to plaintiff, expressed understanding that plaintiff might be uncomfortable because he had worked with Dr. Ball.

Plaintiff argues that there is a link between the 2012 statements and the 2014 statements because Younker was hired to fill a position created in part to replace Dr. Ball's previous job. Plaintiff also points to circumstantial evidence that Younker was not cordial with plaintiff, changed his mind about supporting plaintiff's proposal for a scholarship program, and stated that the sexual harassment allegations against plaintiff were widely known.

Whether the plaintiff's protected speech was a substantial or motivating factor in defendants' decision to fire him is a question of fact. *Eng*, 552 F.3d at 1071. Plaintiff here has

not alleged facts sufficient for a reasonable jury to find that his speech was a motivating factor in defendants' decision to fire him. Although plaintiff alleges some facts which, if true, tend to demonstrate that Younker did not like plaintiff, there are several gaps in the facts and circumstances that prevent them from being sufficient for plaintiff's purpose here.

First, "[courts] have recognized previously that, in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). However, here, three months passed between plaintiff's most recent arguably protected speech and the initiation of the investigation of the sexual harassment complaint against plaintiff. Plaintiff does not claim any adverse employment actions against him during these three months; rather, the adverse employment action at issue occurred after a student reported an incident of sexual harassment, and filed a police report and then a complaint with the University, spurring an investigation. When an employer puts forth a legitimate reason for the adverse employment action, a temporal proximity of three months is by itself insufficient circumstantial evidence to defeat a motion for summary judgment. *See Erickson v. Pierce Cty.*, 960 F.2d 801, 803 (9th Cir. 1992) (court granted summary judgment for employer where there was temporal proximity of three months between employer learning of employee's protected actions and that employee's firing).

Secondly, even if Younker did not like plaintiff's statements about Dr. Ball, that fact is of only ancillary relevance. Younker did not conduct the investigation, give input to the decisionmakers during the formal investigation, or make the decision to fire plaintiff. Younker's role consisted of accompanying the complainant to her initial interview before the investigation began, upon her request. Further, when asked by a University OAAEO investigator if he had any

more information about the incident, the report, or other concerns, or anyone else who might have such information, Younker conveyed in a one-sentence email that the complainant's father had told him that plaintiff assaulted someone in Washington. When viewed in the light most favorable to plaintiff, this is evidence that at most Younker responded to requests as they arose in a way that was unhelpful to and unsupportive of plaintiff. It is not, however, sufficient evidence upon which a reasonable jury could find that Younker retaliated against plaintiff for speaking out against Dr. Ball's termination.

Even if plaintiff spoke on a matter of public concern as a private citizen when he opposed the decision to fire Dr. Ball, there is simply insufficient evidence in the record to support the inference that plaintiff's protected speech was a substantial or motivating factor in his termination. Plaintiff further does not refute defendants' claim that the University would have terminated his employment for violating the sexual harassment policy, even absent the protected speech. His claim therefore cannot survive defendants' motion for summary judgment.

III.    *Employment Discrimination Claims: Pretext*

If a plaintiff establishes a prima facie case of discrimination or retaliation, the burden then shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Chuang v. Univ. of Cal. Davis, Bd. of Trs.,* 225 F.3d 1115, 1123–24 (9th Cir. 2000), *Hawn,* 615 F.3d at 1155. For the reasons explained above, a pretext analysis is not necessary because plaintiff has failed to make out a prima facie case of either discrimination or retaliation. Even if plaintiff had met his prima facie burden, however, summary judgment would be warranted because there is insufficient evidence of pretext.

Defendants assert that they terminated plaintiff because he violated the sexual harassment policy by subjecting a female student to nonconsensual contact and comments of a sexual nature, as established after an investigation.

Defendants' burden of proof here is low.

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted . . . .

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (internal citations omitted). If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination. *Hawn*, 615 F.3d at 1155.

"[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn*, 615 F.3d at 1158. In order to get past summary judgment, even after proving a prima facie case of discrimination and employment retaliation, plaintiff must present specific, substantial evidence of pretext that will survive rigorous examination. *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983).

Evidence of pretext could take many forms. *McDonnell Douglas*, 411 U.S. at 804–05.

> For example, the manner in which the plaintiff was treated by his employer during his employment may be relevant to a showing of pretext. Additionally, the fact that persons outside the plaintiff's protected class were treated better for offenses of comparable seriousness could also help demonstrate pretext. . . . [W]hether summary judgment is appropriate depends on a number of factors, including the strength of the plaintiff's prima facie case and the probative value of the proof that the employer's explanation is false.

*Reynaga*, 847 F.3d at 694 (internal citations omitted). "To establish pretext, 'very little' direct evidence of discriminatory motive is sufficient, but if circumstantial evidence is offered, such evidence has to be 'specific' and 'substantial.'" *Winarto v. Toshiba Am. Elecs. Components, Inc.,* 274 F.3d 1276, 1284 (9th Cir. 2001) (citing *Godwin v. Hunt Wesson Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998)).

Here, such evidence has not been presented. Plaintiff argues that the fact that the University did not fire other tenured professors who had sexual harassment complaints filed against them demonstrates that the University deviated from normal practice by treating plaintiff differently than other similarly situated professors. However, as discussed above, the evidence does not show that the University treated any professors outside of the plaintiff's protected class better in response to comparably serious allegations.

There is further no evidence to link the manner in which plaintiff was treated by the University to racial or gender bias. Plaintiff's statements that he is an openly American Indian man are helpful to establish the first element of the prima facie case, that plaintiff is a known or perceived member of a protected class; but "other circumstances" must be shown to demonstrate the final element, an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802 (1973). At the pretext stage of summary judgment, those other circumstances must be specific and substantial in order to rebut the University's legitimate reason for firing plaintiff. *Winarto,* 274 F.3d at 1284. Here, neither direct evidence nor specific and substantial circumstantial evidence of pretext has been submitted.

In sum, plaintiff has not carried his burden to make out a prima facie case for discrimination or retaliation. Moreover, even if plaintiff had made out a prima facie case, his

evidence falls short of the stringent burden to create a question of material fact regarding whether defendants' reason for firing him was false.[8]

IV.    *Attorney's Fees*

Defendants move for an award of reasonable attorney's fees pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988. Award of attorney's fees is at the Court's discretion. *See* 42 U.S.C. § 1988 ("In any action or proceeding to enforce a provision of sections 1981 . . . [or] 1983 . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . ."); *id.* § 2000e-5 (same).

"[C]ourts are permitted to award attorney's fees to prevailing *plaintiffs* as a matter of course, but are permitted to award attorney's fees to prevailing *defendants* under 42 U.S.C. §§ 1988 and 2000e–5(k) . . . only in exceptional circumstances." *Harris v. Maricopa Cty. Super. Ct.*, 631 F.3d 963, 971 (9th Cir. 2011) (citation and internal quotation marks omitted). "In a civil rights case, fees may be awarded against an unsuccessful plaintiff only if his action is 'meritless in the sense that it is groundless or without foundation.'" *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 202 (9th Cir. 1988) (citing *Hughes v. Rowe,* 449 U.S. 5, 14, (1980)) and *Dooley v. Reiss,* 736 F.2d 1392, 1396 (9th Cir. 1984)).

Here, the claims that plaintiff brought were not "groundless or without foundation" merely because they were not successful. *See Mitchell v. Office of L.A. Cty.*, 805 F.2d 844, 847 (9th Cir. 1986). Plaintiff extensively briefed facts, circumstances, and law supporting his claims, provided evidence, and indicated that he anticipated discovering further evidence. For these reasons, defendants' motion for attorney's fees is denied.

---

[8] Plaintiff concedes that the "[U]niversity's determination that [he] had sexually harassed a freshman female undergraduate student play[ed a] role in its decision" to fire him. Pavel Dep. Vol. 3, 72:6–10 (doc. 80 at 21).

## CONCLUSION

Defendants' second motion for summary judgment (doc. 79) is GRANTED as to all of plaintiff's claims. Defendants' motion for attorney's fees is DENIED.

IT IS SO ORDERED.

Dated this 13th day of March, 2018.

_____
Ann Aiken
United States District Judge